**Frank CALABRESE, Plaintiff,**

v.

**SQUARE D COMPANY, Defendant.**

No. 97 C 2199.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 5, 1998.

Raymond P. Niro, Christopher J. Lee of Niro, Scavone, Haller & Niro, Chicago, IL, for Plaintiff.

Robert E. Wagner, Thomas K. Stine, Richard C. Himelhoch, Marina N. Saito of Wallenstein & Wagner, Ltd., Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

This action was brought by Frank Calabrese ("Calabrese"), holder of United States Patent No. 4,322,849 ("'849 Patent") issued March 30, 1982 on a "Data Relay System," charging infringement of the '849 Patent by Square D Company ("Square D"). After extensive discovery the parties filed a barrage of Fed.R.Civ.P. ("Rule") 56 motions for summary judgment (two on each side), but this Court's initial review suggested that special priority ought to be afforded to the one in which Square D charged Calabrese with having violated the "best mode" requirement of 35 U.S.C. § 112 ¶ 1 ("Section 112 ¶ 1"). That course of action seemed most sensible because Square D's success on that motion would obviate any need for this Court to address what promised to be much more intricate issues, calling for more extended treatment in both factual and legal terms— and conversely, if the motion were unsuccessful nothing would be lost, because the best

mode question would have had to be addressed as part of the Rule 56 package in any event.

Because of the nature of the best mode claim in this case, this Court also regarded the matter as one that would be best served by a rare (at least for this Court) reference to a special master under Rule 53—in this instance a lawyer known to this Court to be knowledgeable and experienced in intellectual property matters, Gerald Geren, Esq. On June 16, 1998 Special Master Geren produced his Report in which he recommended the grant of Square D's summary judgment motion in that respect, and the Report was followed in turn by Calabrese's timely objections (submitted on June 30) and then, at this Court's request, by Square D's response to the Calabrese objections. For the reasons stated in this memorandum opinion and order, this Court independently upholds the Special Master's recommendation and declares the '849 Patent invalid because of Calabrese's noncompliance with the statutory best mode mandate.

### Background Facts

Most of the facts necessary for the present decision will be set forth in this section. To the extent that any factual matters may mesh better with the substantive discussion, they will be set out a bit later.

Calabrese really created his own potential best mode problem by his initial decision to split his patent application, when he first tendered it to the Patent Office, into two separate applications. That of course was a perfectly legitimate thing to do so long as the Patent Office (as it ultimately did in this instance) recognized the applications as covering two discrete inventions and hence as escaping the vice of double patenting (see *In re Berg*, 140 F.3d 1428 (Fed.Cir.1998)).[1]

But Calabrese's problem in this instance stems from the fact that the application for what became the '451 Patent expressly disclosed the preferred embodiment of the invention that was the subject matter of that application (so that there is of course no question as to Calabrese's knowledge of that preferred embodiment), while that same disclosure was omitted from the '849 Patent. That being the case, if the subject of that preferred embodiment was also something that should have been disclosed as part of the best mode for practicing the invention of the '849 Patent now in suit, *that* nondisclosure necessarily invalidates the '849 Patent under Section 112 ¶ 1.

What Calabrese did was to file both of the applications (Serial No. 140,229, from which the '849 Patent ultimately matured, and Serial No. 140,212, from which the '451 Patent ultimately matured) on the same April 14, 1980 date. They were placed into different classes, assigned to different Examiners and then traveled different paths:

1. On April 28, 1981 the Examiner assigned to Serial No. 140,229 issued an Office Action setting out objections and rejections to that application. On July 23, 1981 applicant Calabrese amended claim 1 and proffered arguments in response to the Office Action. That then resulted in allowance of the application and issuance of the '849 Patent on March 30, 1982.

2. By contrast, the Examiner assigned to the other application originally rejected its claim 1 on the basis of double patenting, after which Calabrese amended the claims in that application so as to avoid that rejection. Then two later continuations were filed to that application: Serial No. 488,000 filed May 2, 1983 and Serial No. 06/894,083 filed August 6, 1986. On October 27, 1987—more than five years after issuance of the '849 Patent—the '451 Patent issued.

In consequence of those different paths reflected in the prosecution histories of the two applications, the '849 Patent will expire April 14, 2000, while the '451 Patent will not expire for another 4–1/2 years—on October 27, 2004.

---

1. To be sure, the Patent Office does not have the last word in that respect. Whether each issued patent covers a valid invention is, as always, a matter of judicial determination. And for purposes of the present ruling there is no need for this Court to express any view as to the validity of United States Patent No. 4,703,451 ("'451 Patent"), which grew out of Calabrese's other application that was filed contemporaneously with the application that matured into the '849 Patent now in suit.

Each patent as issued says that its invention has as its "object . . . to provide" ('849 Patent col. 1, lines 23–24) or that the invention "relates to" ('451 Patent col. 1, line 10) a subject described in identical terms: "A data relay system for accessing large quantities of data, of any voltage level, either discrete or analog, from a single source, typically a computer" ('849 Patent col. 1, lines 24–26, '451 Patent col. 1, lines 9–12). And both patents disclose the data relays themselves. But the '451 Patent also discloses as a preferred embodiment, as the '849 Patent does not, an input circuit and a relaying circuit within the data relay system (for receiving and amplifying the address and data information that passes between the data relays and the "host device" or computer).

There is of course no question that the two patents do not have identical claims, else two different patents would never have issued. Here is the critical claim 1 of the '849 Patent, with emphasis added to focus attention on the elements that have proved to be at the heart of the controversy ('849 Patent col. 2, lines 24–46):

1. A data relay system comprising
a host device,
a plurality of data relays each having a unique address,
*data line means for transmitting addresses from said host device sequentially to each of said plurality of data relays and*
*for transmitting data sequentially through each of said plurality of data relays to said host device,*
each of said data relays including means for sequencing a plurality of parallel data groups,
an address selection means for recognizing the address of said data relay transmitted sequentially to each of said plurality of data relays and energizing said sequencing means, and
means for serializing the parallel data group selected by said sequencing means and for transmitting said selected serialized data group to said *data line means whereby the serialized data will be sequentially transmitted through the data relays intermediate the addressed data relay and said host device to said host device.*

*Summary Judgment Principles*

Needless to say, patent cases are no different from any other type of litigation in terms of the burden placed on a summary judgment movant by Rule 56: the need to establish the absence of any genuine issue of material fact, so as to entitle the movant to a judgment as a matter of law. For that purpose the facts are viewed from a perspective favorable to the nonmovant (here Calabrese), aided by reasonable inferences in his favor (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1064 (Fed.Cir.1998)). To be sure, the burden of establishing patent invalidity by clear and convincing evidence rests on the challenger (*Nobelpharma, id.*), so that Square D has a somewhat steeper hill to climb than would be present in what might be viewed as a mine-run Rule 56 motion. But *Nobelpharma, id.* at 1065–66 also confirms the propriety of ruling for the challenger as a matter of law under appropriate circumstances (although *Nobelpharma* dealt with a Rule 50(a)(1) motion, the seminal opinion in *Anderson,* 477 U.S. at 250–52, 106 S.Ct. 2505 teaches that the standards under that Rule and Rule 56 are identical).

As will be seen, what Calabrese attempts here to portray as factual disputes are really red herrings placed across the analytical trial. Even though it is true that best mode analysis is in part subjective in nature (more of this a bit later), Calabrese cannot—as he attempts to do—bootstrap into a Rule–56–defeating factual issue the subjective belief that he claims to have had regarding what he needed to disclose in connection with the application that ripened into the '849 Patent.

*Best Mode Analysis*

■ As briefly indicated in the preceding section, the best mode inquiry implicates both a subjective and an objective component. Here is the description of that inquiry in *Nobelpharma,* 141 F.3d at 1064 (after the opinion there quoted the statutory best mode requirement):

Determining whether a patent fails to comply with the best mode requirement and is thus invalid involves two factual inquiries.

First, the fact-finder must determine whether at the time an applicant filed an application for patent, he or she had a best mode of practicing the invention, which is a subjective determination. Second, if the inventor had a best mode of practicing the invention, the fact-finder must determine whether the best mode was disclosed in sufficient detail to allow a skilled artisan to practice it without undue experimentation, which is an objective determination.

■ Essentially what Calabrese seeks to do is to distort the just-described subjective component of the analysis by insisting that he had no motive or desire to conceal the best mode at issue—after all, he says, he *did* disclose it in a simultaneously-filed application (the one that ultimately matured into the '451 Patent). That contention is in itself a bit disingenuous, given the fact that the nondisclosure in the application that ripened into the '849 Patent at the same time that disclosure was made in the other application ultimately gave Calabrese another 4–1/2 years of legal monopoly because of the widely-separated expiration dates of the two patents as issued. As *In re Berg*, 140 F.3d at 1431–32 (citations omitted) said of the need for exercising special care in such situations:

> Obviousness-type double patenting is a judge-made doctrine that prevents an extension of the patent right beyond the statutory time limit. It requires rejection of an application claim when the claimed subject matter is not patentably distinct from the subject matter claimed in a commonly owned patent. Its purpose is to prevent an unjustified extension of the term of the right to exclude granted by a patent by allowing a second patent claiming an obvious variant of the same invention to issue to the same owner later.

But leaving aside any consideration of the length of the patent monopoly as such, there was of course no assurance when the application was filed that led to the '849 Patent's issuance that a patent would ever issue on the other application. And in any event, the later discussion shows that there was a 4–1/2 year gap after issuance of the '849 Patent when the best mode for practicing that invention remained undisclosed.

■ Even more significantly in terms of the subjective component of the best mode inquiry, an intent to conceal on the part of the inventor is not, of course, an integral part of a best mode violation (as a sort of counterpart of what used to be called "fraud on the Patent Office," now the doctrine of inequitable conduct)—see *Graco, Inc. v. Binks Mfg. Co.*, 60 F.3d 785, 789–90 (Fed.Cir.1995). Concealment, "whether accidental or intentional," is enough (*id.* at 790). Hence what Calabrese urges along those lines, protesting his purity of heart, is really beside the mark. Instead the statutory inquiry really breaks down into these two aspects:

1. Because the subjective component identified in *Nobelpharma* depends solely on whether the inventor was *aware* of the best mode, Calabrese's inclusion of that information in the application that finally ripened into the '451 Patent is conclusive on that score. No room exists for arguing the presence of any genuine issue regarding any fact, let alone a material one, in that respect.

2. That leaves for determination only the question whether the nondisclosure at issue relates to the invention that is the subject matter of the '849 Patent. As stated succinctly in the case on which Calabrese's counsel have sought to place particularly heavy reliance in their objections to the Special Master's Report, *Engel Indus., Inc. v. Lockformer Co.*, 946 F.2d 1528, 1531 (Fed.Cir.1991):

> The best mode inquiry is directed to what the applicant regards as the invention, which in turn is measured by the claims.

■ In that last respect, what Calabrese may or may not have had in his head when he decided not to include the relevant information as to the input and relaying circuits in the '849 Patent's original application is really irrelevant. Instead the scope of the vital claim 1 of the '849 Patent in that regard is for this Court to resolve under the teaching of *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), *aff'g* 52 F.3d 967 (Fed.Cir.1995). As the Federal Circuit has put the matter in its decision that has become the leading expres-

sion of its views on the meaning and application of the *Markman* approach, *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed.Cir.1996) (citations omitted):

> In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence. In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention. Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make this right meaningless.

■ This Court therefore turns to the meaning of the '849 Patent's claim 1, and particularly to the portion emphasized in the earlier quotation of that claim, to determine whether the elements of that claim do or do not call for disclosure of Calabrese's admittedly preferred embodiment of the circuits referred to there. It is at that point that Calabrese is forced to resort to the least tenable position of all—one in which he urges an extraordinarily strained and insupportable meaning for the word "through" that appears at '849 Patent col. 2, lines 31 and 44.

As the Special Master's Report at 4–5 reflects, Calabrese's position is that the '849 Patent's reference to data being transmitted "through" the data relays should be read in the same sense in which, though a car is accurately said to pass "through" an intersection, a different meaning is intended by the colloquialism that refers to the car's passing "through" the controlling traffic light—in the latter case, what is meant is simply going *past* the light. That purported analogy is of course wholly *non* analogous. Here, after all, we are dealing with electric current, which by definition passes "through" the circuitry in the common-sense usage of that term, as contrasted with the wholly figurative concept of passing "through" a traffic light.

As the Special Master's Report accurately finds, the data relays of the '849 Patent are connected by circuitry, and at the time that Calabrese filed the application the best mode that Calabrese knew of for accomplishing that connection comprised the input and relaying circuits that were shown (and acknowledged to be the preferred embodiment) in the application that later matured into the '451 Patent. In adverting to the transmittal of data in '849 Patent col. 2, lines 31–32 and 43–44, Calabrese expressly said that was done sequentially "through" each of the data relays. And it is no accident that in the contemporaneous application that ultimately produced the '451 Patent, the word "through" was used in the identical sense (its col. 2, lines 15–21 referred to the address being received by the data relay and then sent "to" the next data relay "through" the relaying circuit, and at col. 2, lines 22–27 data is said to be transmitted "through" the input circuit where it is reinforced and directed "through" the relaying and input circuits of data relays between the addressed relay and the host (normally a computer)).

Calabrese cannot successfully escape his own original usage and its truly unambiguous plain meaning through his attempted post-hoc disclaimer, when he now regards such a new rationalization as redounding to his advantage. This is not at all an instance of the weighing or discrediting of evidence in violation of the basic Rule 56 standards. On the contrary, Calabrese's own contemporaneous conduct in applying for what became the '451 Patent, with its express disclosure of a preferred embodiment, establishes conclusively that—at the very time that he filed the application that ultimately ripened into the '849 Patent—he considered the reinforcing circuitry to be the best mode of connecting the data relays to the bus in order to improve remote data acquisition. That reinforcing circuitry is utilized in connection with the identical data relay system that Calabrese disclosed in the '849 Patent, and it is therefore also the best mode for transmitting data and addresses through each data relay for the system at issue.

In sum, it is Calabrese's own conduct that has driven the nails into the best-mode coffin in which the '849 Patent must be buried. Calabrese's attempts to climb out of that coffin (in the best Bela Lugosi tradition) via his current unpersuasive attempt to give the patent's language a different meaning cannot succeed in the bright sunlight of analysis (or even, to pursue the Lugosi metaphor, at midnight).

### Conclusion

This Court has given careful study to the perceptive Report generated by the Special Master, to Calabrese's objections to that Report and to Square D's response to those objections. There is indeed no genuine issue of material fact, and Square D is entitled to a judgment as a matter of law as to the '849 Patent's invalidity for its failure to have complied with the best mode requirement of Section 112 ¶ 1.

This Court accordingly declares that the '849 Patent is invalid as a matter of law for that reason. And this ruling necessarily results in the denial of Calabrese's two motions for summary judgment—one on the best mode subject, the other for a judgment of infringement—as well as requiring the denial on mootness grounds of Square D's motion for summary judgment of noninfringement.