**In re Robert GOODMAN, Vic C. Knauf, Catherine M. Houch and Luca Comai.**

No. 93–1073.

United States Court of Appeals, Federal Circuit.

Dec. 3, 1993.

Lloyd R. Day, Jr., Cooley, Godward, Castro, Huddleson & Tatum, Palo Alto, CA, argued for appellant. With him on the brief were, Barbara Rae–Venter, PH.D. and Linda A. Sasaki. Of counsel was, Elizabeth Lassen, Calgene, Inc., Davis, CA.

Teddy S. Gron, Associate Sol., Office of the Sol., Arlington, VA, argued for appellee. With him on the brief were, Fred E. McKelvey, Sol. and Richard E. Schafer, Associate Sol. Of counsel were, Albin F. Drost and Lee E. Barrett, Office of the Sol.

Before RICH, RADER, and SCHALL, Circuit Judges.

RADER, Circuit Judge.

Robert M. Goodman *et al.* (Goodman) appeal the rejection of claims 1–13 of application No. 07/507,380 (the '380 application). The Board of Patent Appeals and Interferences (Board) of the United States Patent and Trademark Office (PTO) rejected for lack of an enabling disclosure and for obviousness-type double patenting. This court affirms the Board.

## BACKGROUND

The claims on appeal define a method of manufacturing mammalian peptides in plant cells. The method calls for integration into plant cells of a DNA construct encoding a mammalian peptide. This transferred DNA construct includes regulatory regions functional in the plant. The regulatory regions instruct the plant cell to transcribe the region of the DNA coding for the mammalian peptide. The method calls for harvesting the valuable peptide after translation of the transcribed messenger RNA.

The application claims an invention of broad scope—a method for producing mammalian peptides in plant cells. When the bacterium *Agrobacterium tumefaciens* infects a wound on a dicotyledonous plant, the bacterium attaches to the plant cell wall and introduces a particular piece of its Ti plasmid [1] DNA into the plant cell. This piece of plasmid is the T–DNA (Transferred DNA). The T–DNA integrates into the nuclear genome of the plant cell. The plant cell then manufactures certain enzymes, encoded according to the T–DNA segment, for synthesis of tumor-specific compounds called opines.

Accordingly, upon insertion of a foreign DNA segment into the T-region of the Ti plasmid, the natural genetic transfer functions of these bacteria introduce the foreign segment into the plant cell genome. Using its own cell machinery, the plant cell then dutifully strives to transcribe the T–DNA

segment and translate the peptide it encodes. Numerous factors affect successful transcription and translation, including the regulatory gene regions (i.e., initiation and termination sequences) preceding and following the T–DNA segment as well as intracellular compounds present during protein formation. If a stable translation product results, the peptide can be harvested from the plant cells.

Independent claim 1 provides:

1. A method for producing a mammalian peptide which comprises:

growing plant cells containing an integrated sequence comprising,

a first expression cassette having in the direction of transcription (1) a transcriptional and translational initiation region functional in said plants cells, (2) a structural gene coding for said mammalian peptide, and (3) a termination region,

whereby said structural gene is expressed to produce said mammalian peptide; and

isolating said mammalian peptide substantially free of plant cell components.

Claims 1–6 specify methods for producing mammalian peptides in plant cells using expression cassettes [2] with initiation codons recognized by plant cells. Claims 7–9 are directed to production of the peptide interferon in plant cells. Claims 10–13 specify nucleic acid constructs for use in the method claims.

The '380 application is a continuation of 06/760,236, which issued as U.S. Patent No. 4,956,282 (the '282 patent). The '282 patent claims a method for producing an interferon in dicotyledonous plant cells. Claim 1 of the '282 patent is identical to claim 8 of the '380 application except that application claim 8 specifies only "plant cells," rather than dicotyledonous plant cells. The '380 application thus has claims broader than those of the issued patent. Stated otherwise,

---

1. Plasmids are extrachromosomal, closed circular nucleic acid molecules found in many bacterial species. The Ti plasmid is a *T*umor *i*nducing plasmid found in the bacterium *Agrobacterium tumefaciens* that is responsible for crown gall disease in plants (producing tumors).

2. Expression cassettes are nucleic acid constructs containing sequences directing the cell to initiate transcription of an incorporated gene. The cassettes can often substitute for one another; frequently a cassette also contains a termination region.

the claims of the '282 patent are species of the genus claimed in the '380 application.

Application claim 9 is similarly identical to claim 2 of the '282 patent with the exception of the dicotyledonous limitation. Application claim 13 is identical to claim 3 of the '282 patent except that the '282 patent is limited to gamma-interferon rather than "an interferon." Accordingly, these claims also present genus-species relationships between the '380 application and the '282 patent.

The specifications of the '282 patent and the '380 application describe the claimed method in general terms, but provide only a single working example. The example describes the formation of an expression cassette with regulatory regions functional in tobacco plants and a structural gene coding for gamma-interferon. In the example the expression cassette is joined to a selectable marker to simplify isolation of plant cells that successfully integrate the construct. The selectable marker consists of regulatory regions functional in tobacco plants and a DNA sequence coding for a tetracycline resistance gene.

Claims 1–6 on appeal, however, purport to cover any desired mammalian peptide produced in any plant cell. Dependent claims 2–6 add limitations—such as specifying the use of a marker, Ti plasmids, and T–DNA boundary regions—but in no way limit the type of mammalian peptide produced or the type of plant cell used.

Independent claim 7, claim 8 dependent therefrom, and claim 9 dependent from claim 8, specify an interferon as the mammalian protein produced by the method. None of the claims, however, limit the type of plant cell in the method.

Claim 10 claims a DNA construct with regulatory regions functional in plant cells and a structural gene coding for an interferon. Claim 11, dependent therefrom, adds the limitation of a second sequence which is a selectable marker. Claim 12, further dependent from claim 11, requires the second sequence to include a T–DNA boundary. Independent claim 13 specifies a DNA construct for producing an interferon in plant cells and

containing an antibiotic resistance selectable marker.

## The Board's Rejection

The Board affirmed the Examiner's rejection of claims 1–9 under 35 U.S.C. § 112, first paragraph. According to the Board, the specification did not enable one of ordinary skill in the art to produce any mammalian peptide with the claimed method on July 29, 1985, the effective filing date of the application. Regarding enablement, the Board stated:

> [E]ven if one were to read into the claim recitation a limitation that the regulatory region was native either to the plant cell in question or the mammalian cell in question, the present specification would still lack adequate guidance to enable one of ordinary skill to extend [Goodman's] invention beyond the single working example.

According to the Board, Goodman's specification did not disclose the "plant functional" regulatory regions for plants beyond the single example. Thus, one of skill in the art could not replicate the invention in "all plants." Furthermore, the Board found that the specification taught only the *Agrobacterium*-mediated transformation method of plant transformation. This method works only with dicotyledonous plant cells, not all "plant cells."

The Board also affirmed the rejection of claims 1–13 under the doctrine of obviousness-type double patenting in light of claims 1–3 of the '282 patent. The Board held that the issuance of the present claims in the absence of a terminal disclaimer would grant an *"unjustified timewise extension of right to exclude* granted by a patent." *In re Schneller,* 397 F.2d 350, 354, 158 USPQ 210, 214 (CCPA 1968) (emphasis added). The Board found that the conflicting claims are not patentably distinct from each other because both claim methods and expression cassettes for producing mammalian peptides in plant cells.

## DISCUSSION

██ Whether Goodman's specification satisfies 35 U.S.C. § 112's enablement re-

quirement is a question of law which this court reviews independently. *In re Vaeck,* 947 F.2d 488, 495, 20 USPQ2d 1438, 1444 (Fed.Cir.1991); *Amgen, Inc. v. Chugai Pharmaceutical Co.,* 927 F.2d 1200, 1212, 18 USPQ2d 1016, 1026 (Fed.Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991). This court reviews the factual findings underlying that conclusion of law for clear error. *Vaeck,* 947 F.2d at 495. Similarly, a rejection under the doctrine of obviousness-type double patenting is a legal conclusion this court reviews freely. *See In re Kaplan,* 789 F.2d 1574, 229 USPQ 678 (Fed.Cir.1986).

### Enablement

■ The first paragraph of 35 U.S.C. § 112 provides:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains ... to make and use the same....

The specification, when filed, must enable one skilled in the particular art to use the invention without undue experimentation. *In re Wands,* 858 F.2d 731, 737, 8 USPQ2d 1400, 1404 (Fed.Cir.1988). Naturally, the specification must teach those of skill in the art "how to make and how to use the invention as broadly as it is claimed." *Vaeck,* 947 F.2d at 496.

■ Goodman's specification contains a single example of producing gamma-interferon in the dicotyledonous species, tobacco. This single example, however, does not enable a biotechnician of ordinary skill to produce any type of mammalian protein in any type of plant cell. The specification does not contain sufficient information to enable the broad scope of the claims. For instance, production of peptides in monocotyledonous plants involves extensive problems unaddressed by Goodman's specification.

In an effort to show that his recombinant methods achieved comparable results in monocots as well as the higher-ordered dicot plants, Goodman cites an article by J.P. Hernalsteens et al., *An Agrobacterium–Trans-*

*formed Cell Culture from the Monocot Asparagus officinalis,* 3 EMBO J. 3039–41 (1984). However, the article found limited success transforming asparagus cells using *A. tumefaciens* as a gene delivery system:

[F]ormal proof that these swellings resulted from T–DNA-induced cell proliferation was not given. Tissue cultures of transformed cell lines were not available, and T–DNA-specific markers such as opines were not identified. Recently, the detection of opines in such swellings on *Narcissus* has been reported (Hooykaas et al., 1984).

However, the presence of nopaline in swellings could be due to a transient expression of the nopaline synthase and would not be indicative for stable T–DNA transformations.... We conclude that T–DNA transfer to at least some of the monocots is possible, and that the opine-specific T–DNA promoters are active in these cells with an efficiency similar to that found in dicots.... Whether this finding can be used as a general method to select transformed monocot cell lines is presently under investigation.

*Id.* at 3040–41. The article expressly invited further "investigation" to determine whether the method works with monocots in general.

Hernalsteens also questioned the results described in Hooykaas–Van Slogteren et al., *Expression of Ti Plasmid Genes in Monocotyledonous Plants Infected with Agrobacterium tumefaciens,* 311 Nature 763 (1984), another reference Goodman cites to show success of the method with monocots. Like Hernalsteens, the Hooykaas–Van Slogteren article advocated more experimentation: "[F]urther research is needed to establish whether crops from other monocot families ... can be transformed by the Ti plasmid." *Id.* at 764. Neither Hernalsteens nor Hooykaas show general use of the claimed method in monocot plants.

A 1985 article by Potrykus et al., *Direct Gene Transfer to Cells of a Graminaceous Monocot,* 199 Mol.Gen.Genet. 183 (1985), characterizes even the modest optimism of Hernalsteens and Hooykaas as a departure from mainstream expectations:

[I]t has been widely considered that monocotyledenous [sic] plants, including the commercially important crop plants of the *Gramineae* family, are insensitive to [Ti plasmid transformation] and thus are not candidates for the use of this gene transfer system. Two recent reports have modified this opinion to some extent....

[Hooykaas and Hernalsteens] have shown that the monocotyledenous [sic] plants tested are susceptible to *Agrobacterium* infection although in neither case was conclusive proof for the transfer and integration of foreign DNA presented.... Members of the family *Gramineae*, to which the most commercially important crops belong, have never been shown to be susceptible. Thus, although some monocots are susceptible to *A. tumefaciens*, there is still a major block to the prospects for genetic engineering of the *Gramineae*.

*Id.* at 187. This article, coupled with the hedgings in the Hernalsteens and Hooykaas articles, shows great unpredictability in the art when Goodman filed the broad claims in the '380 application in 1985.

Goodman's own 1987 article, *Gene Transfer in Crop Improvement*, 236 Science 48 (1987), underscores the "major block" to using the claimed method with monocot plant cells. Goodman reports: "Although data have been cited that *Agrobacterium* can transfer T–DNA to monocotyledonous hosts, clear evidence of T–DNA integration exists only for asparagus, and, even in that case, no transformed plants have been described." *Id.* at 52 (citation omitted).

Thus, even the references cited by Goodman to show enablement support the Board's position that great uncertainties encumbered *Agrobacterium*-mediated transformation in monocot plants at the time of filing. Goodman's 1987 article shows that the claimed invention did not overcome those uncertainties. Claims 6, 8, and 9 recite the *Agrobacterium* method of transformation. The record clearly supports the Board's determination that these claims are not enabled for the breadth of all varieties of plants.

Claims 1–5 and 7 do not include a limitation of transformation via *Agrobacterium*. These claims still specify incorporation of the mammalian peptide sequence into any plant cell. The record does not sustain Goodman's effort to describe other methods of gene transfer for incorporating mammalian peptides into any plant cell.

Goodman's own article describes bacterially mediated DNA transfer as the most advanced system of transformation in 1987, two years after the '380 application's filing date. *Id.* at 51. As the above references report, even this preferred method was ineffectual in the vast majority of monocot plants at the time of filing.

As an alternative method, Goodman suggests gene transfer by direct DNA uptake by the plant, accomplished using protoplasts instead of intact plant cells.[3] This method could encompass monocot as well as dicot plants. Goodman's own report, however, undercuts this method:

Integration into plant chromosomes of foreign DNA introduced by direct uptake is a relatively rare event.... [A]pplication of direct DNA uptake to the cereals [monocots] may be limited because regeneration of whole plants from protoplasts has not yet been achieved for many cereal species.

*Id.* at 52. Again, Goodman makes this unfavorable assessment in 1987, two years after the filing date.

Goodman also asserts microinjection could transfer genes into all plant cells. Under the microinjection method, micropipettes are used to inject DNA solutions into cells. Goodman reported in 1987, however, that transformation by microinjection of plant cells only worked with protoplasts. *Id.* at 53. As with direct DNA uptake, this limitation to protoplasts restricts the method's usefulness in monocots.

A final method of gene transfer cited by Goodman is viral-mediated transformation. Goodman again reported only very limited success with this method in 1987:

In plants, viral-based vectors are not likely to stably transform plant cells because in-

---

**3.** A protoplast is a plant cell that no longer has the rigid cell wall that normally surrounds it.

*See* Bruce Alperts et al., *Molecular Biology of the Cell* 1143 (2d ed. 1989).

tegration of viral genes into plant chromosomes has not been detected. *Id.* Thus, on Goodman's 1985 filing date, the record shows no reliable gene transformation method for use with monocot plants. Each of the methods for monocot plants was fraught with unpredictability. The teachings in the specification do not cure this unpredictability. The record shows that practicing a gene transformation method for all monocot plants, if possible at all in 1985, would have required extensive experimentation that would preclude patentability. *See White Consol. Indus. Inc. v. Vega Servo–Control, Inc.*, 713 F.2d 788, 218 USPQ 961 (Fed.Cir. 1983).

In sum, this court discerns no error in the Board's conclusion of nonenablement. Goodman's specification does not enable one skilled in biotechnology in 1985 to practice the method for all "plant cells" as application claims 1–9 require. The record, especially Goodman's own article, shows the need for extensive experimentation to practice the claimed method for just a few plants, let alone all plant cells as broadly claimed in the application.

### Double Patenting

The Board rejected claims 1–13 on grounds of obviousness-type double patenting. This court, having affirmed the rejection of claims 1–9 on other grounds, need only address the double patenting rejection of claims 10–13.

 To prevent extension of the patent right beyond statutory limits, the doctrine of obviousness-type double patenting rejects application claims to subject matter different but not patentably distinct from the subject matter claimed in a prior patent. *In re Braat*, 937 F.2d 589, 592, 19 USPQ2d 1289, 1291–92 (Fed.Cir.1991). Obviousness-type double patenting is a question of law. *Texas Instruments Inc. v. International Trade Commission*, 988 F.2d 1165, 1179, 26 USPQ2d 1018, 1029 (Fed.Cir.1993).

 The double patenting determination involves two inquiries. First, is the same invention claimed twice? *General Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1278, 23 USPQ2d 1839, 1843 (Fed. Cir.1992). This inquiry hinges upon the scope of the claims in question. *Id.* at 1280; *In re Vogel*, 422 F.2d 438, 441, 164 USPQ 619, 621–22 (CCPA 1970). If the claimed inventions are identical in scope, the proper rejection is under 35 U.S.C. § 101 because an inventor is entitled to a single patent for an invention. *Miller v. Eagle Mfg. Co.*, 151 U.S. 186, 197, 14 S.Ct. 310, 314, 38 L.Ed. 121 (1894); *In re Stanley*, 214 F.2d 151, 153, 102 USPQ 234, 236 (CCPA 1954).

Claim 12 of the application claims a DNA construct to express a gene contained therein. Thus, the preamble of the claim recites "[a]n expression cassette"; however, the compositions of matter claimed are a broad genus of DNA constructs that each have:

[A] DNA sequence having in the direction of transcription a transcriptional and translational initiation region functional in plant cells, a structural gene coding for an interferon ... a termination region functional in plant cells (independent claim 10) [and] including joined to said DNA sequence a second expression cassette comprising a second transcriptional and translational initiation region functional in plant cells, a structural gene coding for a peptide providing a phenotypic property capable of selection in plant cells ... a termination region functional in plant cells (dependent claim 11) [and] including a T–DNA boundary (dependent claim 12).

A comparison of this claim and claim 3 of the '282 patent reveals that claim 3 is simply a species of this broad claim. Claim 3 is likewise simply a species of claim 13 of the application. Thus, the claimed inventions are not identical in scope.

If one claimed invention has a broader scope than the other, the court must proceed to a second inquiry: whether one claim defines merely an obvious variation of the other patent claim. *Vogel*, 422 F.2d at 441. Without a patentable distinction—because the pending claim defines merely an obvious variation of the patented claim—the patentee may overcome the double patenting rejection by filing a terminal disclaimer. *See In re Eckel*, 393 F.2d 848, 157 USPQ 415 (CCPA 1968).

■ In *In re Braat,* 937 F.2d 589, 593 (Fed.Cir.1991), this court required in certain circumstances, an additional inquiry to support the double patenting obviousness rejection. Under these circumstances, a double patenting obviousness rejection will only be sustained if the application claims are not patentably distinct from the prior patent claims, and the prior patent claims are also not patentably distinct from the application claims. This "two-way" analysis is necessary because a later-filed improvement patent may issue before an earlier-filed basic invention. *Id.; see Stanley,* 214 F.2d 151.

In *Braat,* the later-filed application contained claims to a patentable combination that included a subcombination which was the subject of an independent prior application. Although the later-filed application became a patent first, this court did not reduce the term of the earlier-filed, but later-issued, patent. This court did not require a terminal disclaimer because Braat's application was held up not by the applicant, but by "the rate of progress of the application through the PTO, over which the applicant does not have complete control." *Braat,* 937 F.2d at 593. *Cf., Stanley,* 214 F.2d 151 (holding that the broad genus of an earlier-filed application was patentable even though a patent issued for a species of that genus).

This case requires no "two-way" analysis. Although application claims 12 and 13 form the genus containing the species of patent claim 3, PTO actions did not dictate the rate of prosecution. Rather, appellant chose to file a continuation and seek early issuance of the narrow species claims. The appellant also chose to forego an immediate appeal to this court on its broader claims when it filed a continuation application. Moreover, appellant argues that a terminal disclaimer is unwarranted.

Appellant's position could extend the term of the patent grant for many cases in a similar posture. By adopting the easy course of filing a continuation or divisional application to gain a narrow claim, a patentee could gain an extension of the term on a

species when the broad genus later issued. This practice would extend the exclusionary right past the 17-year limit mandated by Congress. Under Supreme Court precedent, only one patent can issue for each patentable invention. *Miller,* 151 U.S. at 197, 14 S.Ct. at 314. A second application—"containing a broader claim, more generical in its character than the specific claim in the prior patent"—typically cannot support an independent valid patent. *Miller,* 151 U.S. at 198, 14 S.Ct. at 315; *see Stanley,* 214 F.2d at 153.

■ Claim 12 and Claim 13 are generic to the species of invention covered by claim 3 of the patent. Thus, the generic invention is "anticipated" by the species of the patented invention. *Cf., Titanium Metals Corp. v. Banner,* 778 F.2d 775, 227 USPQ 773 (Fed. Cir.1985) (holding that an earlier species disclosure in the *prior art* defeats any generic claim)[4]. This court's predecessor has held that, without a terminal disclaimer, the species claims preclude issuance of the generic application. *In re Van Ornum,* 686 F.2d 937, 944, 214 USPQ 761, 767 (CCPA 1982); *Schneller,* 397 F.2d at 354. Accordingly, absent a terminal disclaimer, claims 12 and 13 were properly rejected under the doctrine of obviousness-type double patenting.

■ Appellant chose to group claims 10–12 together, and indeed application claim 12 is dependent on application claim 11, which claim is dependent on application claim 10; therefore, these claims stand or fall together. *In re Sernaker,* 702 F.2d 989, 217 USPQ 1 (Fed.Cir.1983); *In re King,* 801 F.2d 1324, 231 USPQ 136 (Fed.Cir.1986). It follows then that application claims 10 and 11 are—like claim 12—not patentably distinct over patent claim 3. Because claim 12 must, in the absence of a terminal disclaimer, fall because of double patenting over the '282 patent, application claims 10–11 must likewise fall.

### CONCLUSION

The specification provides insufficient guidance to enable one skilled in the art to

---

4. Although this case does not strictly involve prior art because the effective filing date of the patent and the application are identical, the

proposition is sufficiently analogous to lend support.

perform the method of claims 1–9 with any plant cell. Accordingly, this court affirms the rejection of those claims pursuant to 35 U.S.C. § 112, paragraph 1. We also affirm the rejection of claims 10–13 for double patenting.

### Costs

Each party to bear its own costs.

AFFIRMED.

RICH, Circuit Judge, concurs in the result.