ELI LILLY AND COMPANY,
Plaintiff–Cross Appellant,

v.

BARR LABORATORIES, INC.,

and

Apotex, Inc. and Bernard C. Sherman,

and

Geneva Pharmaceuticals, Inc.,
Defendants–Appellants,

and

Interpharm, Inc., Defendant.

Nos. 99–1262, 99–1263, 99–1264, 99–1303.

United States Court of Appeals,
Federal Circuit.

Aug. 9, 2000.

Charles E. Lipsey, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., of Washington, DC, argued for plaintiff-cross appellant, Eli Lilly and Company. With him on the brief were Allen M. Sokal, Kenneth M. Frankel, and David S. Forman. Of counsel was L. Scott Burwell. Of counsel on the brief were Douglas K. Norman, and James P. Leeds, Eli Lilly and Company, of Indianapolis, Indiana.

Richard S. Clark, Rochelle K. Seide, Marta E. Delsignore, Louis Sorell, Robert Neuner, and Thomas J. Parker, Baker & Botts, of New York, New York, for defendant-appellant, Geneva Pharmaceuticals, Inc.

George C. Lombardi, Winston & Strawn, of Chicago, Illinois, argued for defendant–appellant Barr Laboratories, Inc. With him on the brief were James F. Hurst, Dan K. Webb, Bradley C. Graveline, Christine J. Siwik, and Taras A. Gracey. Of counsel on the brief was Mark E. Waddell, Bryan Cave, LLP, of New York, New York. Of counsel was Derek John Sarafa.

Hugh L. Moore, and Diane I. Jennings, Lord, Bissell & Brook, of Chicago, Illinois for defendants-appellants Apotex, Inc. and Bernard C. Sherman.

Before MAYER, Chief Judge, FRIEDMAN, Senior Circuit Judge, and GAJARSA, Circuit Judge.

GAJARSA, Circuit Judge.

Barr Laboratories, Inc. ("Barr"), in December 1995, filed an Abbreviated New Drug Application ("ANDA") under the Hatch–Waxman Act, see 21 U.S.C. § 355(j)(2)(A)(vii)(IV) (1994), seeking approval from the Food and Drug Administration ("FDA") to market fluoxetine hydrochloride as an antidepressant. Fluoxetine hydrochloride is the active ingredient in Eli Lilly and Company's ("Lilly's") antidepressant drug Prozac. Lilly, on April 10, 1996, pursuant to 35 U.S.C. § 271(e)(2)(A) (1994), brought an in-

fringement action in the United States District Court for the Southern District of Indiana, alleging that Barr's ANDA application infringed claim 5 of U.S. Patent No. 4,314,081 ("the '081 patent") and claim 7 of U.S. Patent No. 4,626,549 ("the '549 patent"). Lilly subsequently brought infringement actions against Geneva Pharmaceuticals, Inc., Apotex, Inc., and Bernard C. Sherman, all of whom had also filed ANDA applications with the FDA, and the actions were consolidated.

Barr and the other defendants (collectively "Barr") argued, *inter alia*, that claim 5 of the '081 patent and claim 7 of the '549 patent are invalid for failure to comply with the best mode requirement and that claim 7 of the '549 patent is invalid for double patenting. On cross-motions for summary judgment, the district court held in favor of Lilly, concluding that neither claim violates the best mode requirement and that no double patenting exists.[1] Barr appeals the district court's summary judgment rulings, and Lilly cross-appeals the district court's ruling that Barr was entitled to a jury trial on its invalidity counterclaims. Because we hold that both claims comply with the best mode requirement but that claim 7 of the '549 patent is invalid for obviousness-type double patenting, we affirm-in-part and reverse-in-part. Accordingly, we also vacate the district court's ruling that Barr is entitled to a jury trial because we dispose of the validity issues on appeal.

## I. BACKGROUND

The present appeal concerns the validity of claim 5 of the '081 patent that covers the pharmaceutical compound fluoxetine hydrochloride—the active ingredient in Lilly's antidepressant drug Prozac—and claim 7 of the '549 patent that covers the administration of fluoxetine hydrochloride to inhibit serotonin uptake in an animal's brain neurons.

On January 10, 1974, Lilly filed application Serial No. 432,379 ("the '379 application") containing claims for a class of compounds, therapeutic methods of using those compounds, and pharmaceutical compositions comprising those compounds. The '379 application named Bryan B. Molloy ("Molloy") and Klaus K. Schmiegel as inventors. After its filing, the '379 application engendered a progeny of divisional applications, continuation applications, and patents that rivals the Hapsburg legacy. When the last patent stemming from the '379 application issued in December 1986, the application had spawned four divisional applications, three continuation applications, and six patents. During that twelve-year period, Lilly obtained six patents relating to fluoxetine hydrochloride—the '081 and '549 patents, as well as U.S. Patent Nos. 4,018,895 ("the '895 patent"), 4,194,009 ("the '009 patent"), 4,590,213 ("the '213 patent"), and 4,329,356 ("the '356 patent"). The '213 and '356 patents did not stem from the '379 application, and during the course of this litigation, Lilly disclaimed those patents.

The '009 patent, which expired in April 1994, claimed a class of pharmaceutical compounds, including fluoxetine hydrochloride, for administration in pyschotropically effective amounts. The '895, '213, and '356 patents related to methods for treating particular ailments by administering a pharmaceutical compound within a class of compounds that includes fluoxetine hydrochloride. Specifically, the '895 patent, which expired in April 1994, concerned the treatment of humans suffering from depression; the '213 patent concerned the treatment of humans suffering from anxiety; and the '356 patent concerned the treatment of animals suffering from hypertension.

In December 1995, pursuant to a Paragraph IV certification under the Hatch–Waxman Act, *see* 21 U.S.C.

---

1. All other issues relating to validity were resolved by consent of the parties. As a result, the district court's judgment disposed of all claims at issue.

§ 355(j)(2)(A)(vii)(IV) (1994),[2] Barr filed an ANDA application seeking FDA approval to market fluoxetine hydrochloride as an antidepressant. Lilly responded by bringing an action in district court under 35 U.S.C. § 271(e)(2)(A) (1994),[3] asserting that Barr's ANDA application infringed claim 7 of the '549 patent and claim 5 of the '081 patent.

At the district court, Barr argued that both claims are invalid for failure to comply with the best mode requirement and that claim 7 of the '549 patent is invalid for obviousness-type double patenting. With regard to the issue of best mode, Barr advanced two independent arguments. First, Barr argued that the claims are invalid because the patents failed to disclose Molloy's preferred method for synthesizing p-trifluoromethylphenol—a starting material necessary to make fluoxetine hydrochloride. Second, Barr argued that the claims are invalid because the patents failed to disclose Molloy's preferred solvent for recrystallizing fluoxetine hydrochloride. With regard to the issue of double patenting, Barr advanced three independent arguments, contending that claim 7 of the '549 patent is invalid in light of (1) the '356 and '213 patents, (2) the '895 and '009 patents, and (3) the '081 patent.

On cross motions for summary judgment, the district court held in favor of Lilly, concluding that claim 5 of the '081 patent and claim 7 of the '549 patent do not violate the best mode requirement and that claim 7 is not invalid for double patenting under any of Barr's theories. This appeal followed. Because these issues concern disparate parts of the record evidence, we describe separately the background relevant to each argument.

The Claims at Issue

A. Claim 5 of the '081 patent

Stemming directly from the '379 application, the '081 patent issued on February 2, 1982. Claim 5 of the '081 patent, which depends on claim 1, covers the compound N-methyl 3-(p–trifluoromethylphenoxy)-3–phenylpropylamine hydrochloride—commonly referred to as fluoxetine hydrochloride—and pharmaceutically-acceptable acid addition salts thereof formed with non-toxic acids. Claim 1, in turn, provides as follows:

A compound of the formula

wherein each R' is independently H or $CH_3$ and R is m– or p–chlorophenyl, o–, m–, or p–methoxyphenyl, phenyl, o– or m–fluorophenyl, o– or p–tolyl, 2,4–difluorophenyl or p–trifluoromethylphenyl and acid addition salts formed with pharmaceutically–acceptable acids.

2. This section provides, in pertinent part, as follows:

> An abbreviated application for a new drug shall contain ... a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the listed drug ... for which the applicant is seeking approval under this subsection ... that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted.

35 U.S.C. § 355(j)(2)(A)(vii)(IV).

3. This section provides, in pertinent part, that "[i]t shall be an act of infringement to submit ... an application under ... [the Hatch–Waxman Act] ... for a drug claimed in a patent or the use of which is claimed in a patent." 35 U.S.C. § 271(e)(2)(A).

### B. Claim 7 of the '549 patent

On March 31, 1986, Lilly filed continuation application Serial No. 846,448, claiming the benefit of the 1974 filing date of the '379 application under 35 U.S.C. § 120. On December 2, 1986, the application matured into the '549 patent. Claim 7 of the '549 patent, which depends on claim 4, relates to blocking the uptake of the monoamine serotonin in an animal's brain neurons through administration of the compound N–methyl–3–(p–trifluoromethylphenoxy)–3–phenylpropylamine hydrochloride—commonly referred to as fluoxetine hydrochloride. Claim 4 provides as follows:

A method of blocking the uptake of monoamines by brain neurons in animals comprising administering to said animal a monoamine blocking amount of a compound of the formula

wherein each R' is independently hydrogen or methyl; wherein R is naphthyl or

wherein R'' and R''' are halo, trifluoromethyl, $C_1$ –$C_4$ alkyl, $C_1$ –$C_3$ alkyloxy or $C_3$ –$C_4$ alkenyl; and wherein n and m are 0, 1 or 2; and acid addition salts thereof formed with pharmaceutically-acceptable acids.

### C. Best Mode: p-trifluoromethylphenol

Both the '081 and '549 patents identify p-trifluoromethylphenol as a starting material for making fluoxetine hydrochloride. During the early stages of experimentation, Molloy used commercial p-trifluoromethylphenol purchased from Marshallton Research Laboratories. However, when large quantities of p-trifluoromethylphenol were necessary for clinical testing, Lilly's division director refused to purchase p-trifluoromethylphenol due to the high costs. Instead, he required that Molloy and his colleagues synthesize their own p-trifluoromethylphenol.

To that end, Molloy worked with Lilly scientist Edward Lavagnino ("Lavagnino") to devise a cost efficient method of synthesizing p-trifluoromethylphenol. After experimenting with various prior art methods, Molloy concluded that those methods were inadequate for generating a sufficient amount of p-trifluoromethylphenol for use in clinical testing. Then, following further research, Molloy and Lavagnino developed their own method for preparing p-trifluoromethylphenol that, as Lavagnino described in his deposition, was "superior" because it used "real cheap" starting material "available [in] tank car quantities." Also, in an article written after the filing of the '379 application, Molloy described his new synthesizing method as an improve-

ment over prior art, because the "literature methods for [p-trifluoromethylphenol's] preparation are cumbersome and not easily adapted to large scale operations."

The '081 and '549 patents do not claim the material p-trifluoromethylphenol or a method for synthesizing it, nor do they disclose Molloy's method for synthesizing it.

#### D. Best Mode: Recrystallization

While experimenting with compounds claimed in the '081 and '549 patents, Molloy recrystallized the compounds in order to remove impurities and enhance their suitability for pharmaceutical use. The recrystallization process involved using a solvent to dissolve a sample of the compound and then separating the desired product in crystalline form from the impurities that remained dissolved. Between February 1973 and January 1974, Molloy and other Lilly scientists experimented with various solvents for recrystallizing fluoxetine hydrochloride and eventually found a particular solvent that produced a higher yield and higher purity than other solvents.

The record evidence illustrates that while Lilly scientists knew that some solvents for recrystallizing fluoxetine hydrochloride were more effective than others, choosing a suitable recrystallization solvent was well known to one of ordinary skill in the art. In particular, Dr. Elias J. Corey ("Corey"), a Nobel laureate, testified that fluoxetine hydrochloride is "generally quite easy to purify by recrystallizaton." Corey also explained that, although it requires some experimentation, selecting a recrystallization solvent is "very

straightforward." Further, Barr's expert testified that "in 1974, sometimes the recrystallization of amine hydrochlorides was indeed routine."

The '081 and '549 patents do not claim a process for recrystallizing fluoxetine hydrochloride nor do they disclose any solvents for use in the recrystallizing fluoxetine hydrochloride.

#### E. Double Patenting: The '895 patent

On March 4, 1977, divisional application Serial No. 614,094 matured into the '895 patent. Claim 1 of the '895 patent, the only independent claim, provides as follows:

A method of treating human suffering from depression which comprises administering to said human an effective antidepressant dose of a compound of the formula:

wherein each R' is independently hydrogen or methyl; wherein R is naphthyl or

wherein R" and R'" are halo, trifluoromethyl, $C_1 - C_4$ alkyl, $C_1 - C_3$ alkyloxy or $C_3 - C_4$ alkenyl; and wherein n and m are 0, 1 or 2; and acid addition salts thereof formed with a pharmaceutically-acceptable acid.

Put differently, claim 1 of the '895 patent covers the administration of a pharmaceutical compound within a class of claimed compounds to treat depression in humans. The '895 patent expired in April 1994.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*. *See Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575, 29 U.S.P.Q.2d 1373, 1377 (Fed.Cir.1994). Summary judgment is appropriate when, based on the record, no genuine issue exists as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). A genuine issue exists if the evidence is such that a reasonable jury could find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *General Mills, Inc. v. Hunt–Wesson, Inc.*, 103 F.3d 978, 980, 41 U.S.P.Q.2d 1440, 1442 (Fed.Cir.1997). A disputed fact is material if it might affect the outcome of the suit such that a finding of that fact is necessary and relevant to the proceeding. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *General Mills*, 103 F.3d at 980, 41 U.S.P.Q.2d at 1442.

When evaluating a motion for summary judgment, the court views the record evidence through the prism of the evidentiary standard of proof that would pertain at a trial on the merits. *See Anderson*, 477 U.S. at 252–53, 106 S.Ct. 2505. Under the patent statutes, a patent enjoys a presumption of validity, *see* 35 U.S.C. § 282 (1994), which can be overcome only through clear and convincing evidence, *see United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1563, 41 U.S.P.Q.2d 1225, 1232 (Fed.Cir.1997).

Thus, a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise. Alternatively, a moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent. In determining whether a genuine issue of material fact exists, the court views the evidence in the light most favorable to the nonmoving party and resolves all doubts in its favor. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1274, 35 U.S.P.Q.2d 1035, 1038 (Fed.Cir. 1995).

## III. BEST MODE

Pursuant to section 112, ¶ 1, a patent specification must set forth the "best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112, ¶ 1 (1994). The best mode requirement creates a statutory bargained-for-exchange by which a patentee obtains the right to exclude others from practicing the claimed invention for a certain time period, and the public receives knowledge of the preferred embodiments for practicing the claimed invention. *See Spectra–Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1532, 3 U.S.P.Q.2d 1737, 1742 (Fed.Cir.1987) (quoting *In re Gay*, 50 C.C.P.A. 725, 309 F.2d 769, 772, 135 U.S.P.Q. 311, 315 (1962)).

Our case law explicating the best mode requirement focuses on a two-prong inquiry. *See Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 927–28, 16 U.S.P.Q.2d 1033, 1036–37 (Fed.Cir.1990). First, the factfinder must determine whether, at the time of filing the application, the inventor possessed a best mode for practicing the invention. *See Fonar Corp. v. General Elec. Co.*, 107 F.3d 1543,

1548, 41 U.S.P.Q.2d 1801, 1804 (Fed.Cir. 1997); *United States Gypsum Co. v. National Gypsum Co.,* 74 F.3d 1209, 1212, 37 U.S.P.Q.2d 1388, 1390 (Fed.Cir.1996). Second, if the inventor possessed a best mode, the factfinder must determine whether the written description disclosed the best mode such that one reasonably skilled in the art could practice it. *See Fonar,* 107 F.3d at 1548, 41 U.S.P.Q.2d at 1804; *U.S. Gypsum,* 74 F.3d at 1212, 37 U.S.P.Q.2d at 1390. The first prong involves a subjective inquiry, focusing on the inventor's state of mind at the time of filing. *See U.S. Gypsum,* 74 F.3d at 1212, 37 U.S.P.Q.2d at 1390; *Chemcast,* 913 F.2d at 928, 16 U.S.P.Q.2d at 1036. The second prong involves an objective inquiry, focusing on the scope of the claimed invention and the level of skill in the art. *See U.S. Gypsum,* 74 F.3d at 1212, 37 U.S.P.Q.2d at 1390; *Chemcast,* 913 F.2d at 928, 16 U.S.P.Q.2d at 1036–37.

 With respect to the second prong of the best mode requirement, the extent of information that an inventor must disclose depends on the scope of the claimed invention. *See Engel Indus. v. Lockformer Co.,* 946 F.2d 1528, 1531, 20 U.S.P.Q.2d 1300, 1302 (Fed.Cir.1991). Accordingly, an inventor need not disclose a mode for obtaining unclaimed subject matter unless the subject matter is novel and essential for carrying out the best mode of the invention. *See Applied Med. Resources Corp. v. United States Surgical Corp.,* 147 F.3d 1374, 1377, 47 U.S.P.Q.2d 1289, 1291 (Fed.Cir.1998). Furthermore, the best mode requirement does not extend to production details or routine details. *See Young Dental Mfg. Co., Inc. v. Q3 Special Prods., Inc.,* 112 F.3d 1137, 1143, 42 U.S.P.Q.2d 1589, 1594–95 (Fed.Cir.1997). Production details, which do not concern the "quality or nature of the [claimed] invention," *see id.* at 1143, 112 F.3d 1137, 42 U.S.P.Q.2d at 1595, relate to commercial and manufacturing considerations such as equipment on hand, certain available materials, prior relationships with suppliers, expected volume of production, and costs, *see Wahl Instruments, Inc. v. Acvious, Inc.,* 950 F.2d 1575, 1581, 21 U.S.P.Q.2d 1123, 1128 (Fed.Cir.1991) (explaining that a "step or source or technique considered 'best' in a manufacturing circumstance may have been selected for a non-'best mode' reason"). Routine details, on the other hand, implicate the quality and nature of invention, but their disclosure is unnecessary because they are readily apparent to one of ordinary skill in the art. *See Young Dental,* 112 F.3d at 1143, 42 U.S.P.Q.2d at 1595.

At the district court, Barr advanced two independent reasons for invalidating the '081 and '549 patents for failure to disclose the best mode: (1) Lilly failed to disclose Molloy's preferred method for synthesizing p-trifluoromethylphenol, and (2) it failed to disclose Molloy's preferred solvent for recrystallizing the fluoxetine hydrochloride compound. On cross motions for summary judgment, the district court held in favor of Lilly. Barr appeals, and we address each argument in turn.

A. Synthesizing p-trifluoromethylphenol

 Barr contends that claim 5 of the '081 patent and claim 7 of the '549 patent do not meet the best mode requirement because the patents fail to disclose Molloy's method for synthesizing p-trifluoromethylphenol. In the present case, even assuming that Molloy preferred his method for synthesizing p-trifluoromethylphenol to alternative means of obtaining the material, we hold that failure to disclose the synthesizing method does not contravene the best mode requirement.

We begin our analysis by examining the scope of the claimed inventions. *See Engel Indus.,* 946 F.2d at 1531, 20 U.S.P.Q.2d at 1302 ("The best mode inquiry is directed to what the applicant regards as his invention, which in turn is measured by the claims."). Claim 5 of the '081 patent covers a formula for the compound fluoxetine hydrochloride, and claim 7 of the '549 patent covers a method for blocking the

uptake of serotonin by brain neurons through administering a dosage of fluoxetine hydrochloride. Example 1 in both the '081 and '549 patents identifies the chemical p-trifluoromethylphenol as a starting material for making fluoxetine hydrochloride. Neither patent, however, claims p-trifluoromethylphenol itself or a method for synthesizing it. Thus, while the best mode for developing fluoxetine hydrochloride involves use of p-trifluoromethylphenol, the claimed inventions do not cover p-trifluoromethylphenol and the patents do not accord Lilly the right to exclude others from practicing Molloy's method for synthesizing p-trifluoromethylphenol. As a result, the best mode requirement does not compel disclosure of Molloy's unclaimed method for synthesizing p-trifluoromethylphenol.

Furthermore, the circumstances here are different from those in *Dana Corp. v. IPC Ltd., Partnership,* 860 F.2d 415, 418, 8 U.S.P.Q.2d 1692 (Fed.Cir.1988), and *Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 940–41, 15 U.S.P.Q.2d 1321, 1328 (Fed.Cir.1990), in which an inventor failed to disclose unclaimed subject matter that was necessary for carrying out the best mode of the invention. In the present case, Molloy disclosed his preference for using p-trifluoromethylphenol when making fluoxetine hydrochloride. What he did not disclose, nor was he required to do so, was the unclaimed method for synthesizing p-trifluoromethylphenol. *Cf. Randomex, Inc. v. Scopus Corp.,* 849 F.2d 585, 590, 7 U.S.P.Q.2d 1050, 1054 (Fed.Cir.1988) (finding no violation of best mode requirement by concealment of a preferred cleaning fluid formula when the claimed invention "neither added nor claimed to add anything to the prior art respecting cleaning fluid").

■ To be sure, if the best mode for carrying out a claimed invention involves novel subject matter, then an inventor must disclose a method for obtaining that subject matter even if it is unclaimed. *See Applied Med. Resources Corp. v. United States Surgical Corp.,* 147 F.3d 1374, 1377, 47 U.S.P.Q.2d 1289, 1291 (Fed.Cir.1998); *Wahl Instruments,* 950 F.2d at 1583–84, 21 U.S.P.Q.2d at 1130. That, however, is not the case here. In the present case, the record insistently demonstrates that p-trifluoromethylphenol was commercially available at the time Lilly filed its original application. The record includes a product catalog from Marshallton Research Laboratories, dated January 1973, offering to sell p-trifluoromethylphenol. The record also contains an expert witness report explaining that p-trifluoromethylphenol was commercially available before 1974 from Aldrich Chemical Company. Additionally, the record includes prior art references that describe methods for preparing p-trifluoromethylphenol.

Barr contends that *Clayton v. Akiba,* 214 U.S.P.Q. 374 (Bd.Pat.App.1982), supports its position that Lilly was obligated to disclose the method for synthesizing p-trifluoromethylphenol. We do not find that argument persuasive. *Clayton,* aside from being non-binding on this court, involves facts that are inapposite to the present case. In *Clayton,* the claimed invention was a chemical compound, and the Board found that the inventor violated the best mode requirement by failing to disclose his method for preparing a necessary intermediate compound. *See id.* at 380–81. The Board's reasoning, however, hinged on the fact that the intermediate compound was *"itself admittedly a novel compound . . . and, thus, its preparation [was] part and parcel of 'carrying out' the invention." Id.* at 381 (emphasis added). Here, by contrast, the chemical p-trifluoromethylphenol, as explained above, was commercially available and described in the prior art.

Barr also seizes upon portions of the record evidence in an effort to establish a best mode violation. For example, Barr relies on Lavagnino's deposition testimony that Molloy's method for synthesizing p-trifluoromethylphenol used material "available in tank car quantities, real cheap

chemical, and simple transformations." Barr also cites Lavagnino's statement explaining that Molloy's synthesizing method could be "scaled up" to produce large amounts of p-trifluoromethylphenol. Barr points to Molloy's own statement that "the relatively high cost" of p-trifluoromethylphenol "is a limiting factor in its use as a chemical intermediate," and that he preferred his synthesizing method because other methods were "cumbersome and not easily adapted to large scale operations." Finally, Barr relies on evidence that Lilly stopped purchasing p-trifluoromethylphenol after Molloy developed his synthesizing method.

Rather than establishing a best mode violation, this amalgam of evidence provides paradigmatic examples of production details that the law excepts from best mode disclosure. Indeed, this evidence relates to considerations of costs, volume, and available resources for manufacturing fluoxetine hydrochloride, all details that are superfluous to the best mode requirement. *See Wahl Instruments,* 950 F.2d at 1581–82, 21 U.S.P.Q.2d 1128–29 (holding no best mode violation for failure to disclose a method chosen for reasons of cost and volume). In short, the reasons for using Molloy's synthesizing method were not linked to the intrinsic quality of fluoxetine hydrochloride, which is the thrust of the best mode requirement.

### B. Recrystallization Solvent

 Barr also argues that claim 5 of the '081 patent and claim 7 of the '549 patent violate the best mode requirement because Molloy failed to disclose the particular recrystallization solvent that he used to purify fluoxetine hydrochloride. Even assuming that Molloy preferred a particular and specific recrystallization solvent to others, we hold that failure to disclose that solvent does not violate the best mode requirement.

Once again, we begin our analysis with the scope of the claimed invention. *See Engel Indus.,* 946 F.2d at 1531, 20

U.S.P.Q.2d at 1302. Claim 5 of the '081 patent covers the compound fluoxetine hydrochloride, and claim 7 of the '549 patent covers a method for administering it. Both patents teach that the preferred embodiment of fluoxetine hydrochloride is achieved by purifying the compound through recrystallization. Based on the record, there is no genuine issue that one of ordinary skill in the art possessed the requisite knowledge to select a solvent for recrystallizing fluoxetine hydrochloride. Even Barr's expert testified that "in 1974, sometimes the recrystallization of amine hydrochlorides was indeed routine." Choosing a solvent for performing recrystallization, therefore, constitutes a routine detail that falls outside the ambit of the best mode disclosure. *See Young Dental,* 112 F.3d at 1144, 42 U.S.P.Q.2d at 1595; *Fonar,* 107 F.3d at 1549, 41 U.S.P.Q.2d at 1805 ("It is well established that what is within the skill of the art need not be disclosed to satisfy the best mode requirement as long as that mode is described.").

Barr contends that, even if choosing a solvent for recrystallization is a routine detail, the best mode requirement compels Molloy to disclose the particular and specific solvent he used in the recrystallization process. In effect, Barr argues that Molloy was obligated to disclose not only the preferred embodiment of the claimed invention but also the preferred solvent for the unclaimed recrystallization process. Stated at a higher level of generality, Barr asserts that a patentee must disclose a preferred mode for carrying out an unclaimed routine detail. That position, however, is in conflict with the scope of the claims at issue, our prior decisions, and the purpose undergirding the best mode requirement.

As we have often said, "[i]t is concealment of the best mode of practicing the *claimed invention* that section 112, ¶ 1 is designed to prohibit." *Chemcast,* 913 F.2d at 927, 16 U.S.P.Q.2d at 1036 (emphasis added). Here, the patents disclose that the best mode of the claimed invention is

fluoxetine hydrochloride that is purified through recrystallization. The patents, however, do not claim a process for purifying fluoxetine hydrochloride through recrystallization or a solvent for performing the recrystallization. Thus, failure to disclose a preferred solvent does not equate to a best mode violation because the patents simply do not claim a recrystallization process or a recrystallization solvent. *See Engel Indus.*, 946 F.2d at 1531, 20 U.S.P.Q.2d at 1302 ("Unclaimed subject matter is not subject to the disclosure requirements of § 112; the reasons are pragmatic: the disclosure would be boundless and the pitfalls endless."); *cf. Northern Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1288, 55 U.S.P.Q.2d 1065, 1070 (Fed.Cir.2000) (holding no best mode violation when inventor did not disclose an unclaimed, preferred method for use of the claimed invention—thin-line etching—because the claim covered a general process of plasma etching and the patent described the best mode for carrying out that process).

■■■ Further, section 112 requires only "an adequate disclosure of the best mode." *Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 927 F.2d 1200, 1212, 18 U.S.P.Q.2d 1016, 1025–26 (Fed.Cir.1991). It logically follows that a patentee's failure to disclose an unclaimed, preferred mode for accomplishing a routine detail does not violate the best mode requirement because one skilled in the art is aware of alternative means for accomplishing the routine detail that would still produce the best mode of the claimed invention. Indeed, here, Barr and other companies are able to recrystallize fluoxetine hydrochloride by using solvents different from the one Molloy used. In addition, our cases hold that a patentee complies with section 112 even though some experimentation is necessary to practice the best mode. *See id.* (holding that best mode does not require a "guarantee that every aspect of the specification be precisely and universally reproducible"); *Scripps Clinic & Research Found.*

*v. Genentech, Inc.*, 927 F.2d 1565, 1579–80 (Fed.Cir.1991); *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384–85, 231 U.S.P.Q. 81, 94 (Fed.Cir. 1986). In *Hybritech*, for example, this court held that the patentee did not violate section 112 even though carrying out the best mode of the invention involved screening experiments that were laborious and time consuming, because screening methods were known in the art. *See* 802 F.2d at 1384–85, 231 U.S.P.Q. at 94. Similarly, in the present case, solvents for recrystallizing fluoxetine hydrochloride were known in the art, and simply because selecting a desired solvent may have required some experimentation, non-disclosure of Molloy's particular solvent does not rise to a best mode violation.

Moreover, the purpose behind the best mode requirement supports our conclusion. As we explained in *Amgen*, the best mode requirement establishes a *quid pro quo* whereby the patentee "must not receive the right to exclude others unless at the time of filing he has provided an adequate disclosure of the best mode." 927 F.2d at 1210, 18 U.S.P.Q.2d at 1024. The best mode requirement, however, is a two-way street, and in the present case, the '081 and '549 patents do not grant Lilly the right to exclude others from practicing Molloy's method of recrystallization or from using his preferred solvent. Thus, it would be incongruous to require that Molloy disclose that information nonetheless. *See Randomex*, 849 F.2d at 588, 7 U.S.P.Q.2d at 1053 ("It is concealment of the best mode of practicing the *claimed invention* that section 112, ¶ 1 is designed to prohibit." (emphasis in original)).

In sum, because no genuine issue of material fact exists upon which a reasonable jury could find that claim 5 and claim 7 did not comply with the best mode requirement, we affirm the district court's grant of summary judgment in favor of Lilly. Thus, we have no occasion to determine if Barr has a right to a jury trial on that issue.

## III. DOUBLE PATENTING

 Through a statutorily prescribed term, Congress limits the duration of a patentee's right to exclude others from practicing a claimed invention. *See* 35 U.S.C. § 154(a)(2) (Supp.1998) (discussing the length of a patent term). The judicially-created doctrine of obviousness-type double patenting cements that legislative limitation by prohibiting a party from obtaining an extension of exclusive rights through claims in a later patent that are not patentably distinct from claims in an earlier patent. *See In re Braat,* 937 F.2d 589, 592, 19 U.S.P.Q.2d 1289, 1291–92 (Fed.Cir.1991); *In re Longi,* 759 F.2d 887, 892, 225 U.S.P.Q. 645, 648 (Fed.Cir.1985) (explaining that, even though no explicit statutory basis exists for obviousness-type double patenting, the doctrine is necessary to prevent a patent term extension through claims in a second patent that are not patentably distinct from those in the first patent). As our predecessor court explained, "[t]he fundamental reason for the rule [of obviousness-type double patenting] is to prevent unjustified timewise extension of the right to exclude granted by a patent no matter how the extension is brought about." *In re Van Ornum,* 686 F.2d 937, 943–44, 214 U.S.P.Q. 761, 766 (CCPA 1982) (quoting *In re Schneller,* 55 C.C.P.A. 1375, 397 F.2d 350, 158 U.S.P.Q. 210, 214 (1968)).[4]

 Obviousness-type double patenting entails a two-step analysis. First, as a matter of law, the court construes the claim in the earlier patent and the claim in the later patent, and it overlays the later claim on the earlier claim to determine whether the later claim encompasses subject matter previously claimed.[5] *See Georgia–Pacific Corp. v. United States Gypsum Co.,* 195 F.3d 1322, 1326, 52 U.S.P.Q.2d 1590, 1593 (Fed.Cir.1999) (stating that "analysis of the claims is the first step" in an obviousness-type double patenting inquiry); *General Foods Corp. v. Studiengesellschaft Kohle,* 972 F.2d 1272, 1279, 23 U.S.P.Q.2d 1839, 1844 (Fed.Cir. 1992). Second, the court determines whether the differences in subject matter between the two claims is such that the claims are patentably distinct. *See Georgia–Pacific,* 195 F.3d at 1327, 52 U.S.P.Q.2d at 1595 (proceeding to determine whether differences between the two claims are patentably distinct after construing the claims); *General Foods,* 972 F.2d at 1279, 23 U.S.P.Q.2d at 1844 (explaining that the terms "patentably distinguishable," "patentable distinctions," and obvious variations are equivalent for analytical purposes).

 At the district court, Barr proffered three independent theories under which it sought to invalidate claim 7 of the '549 patent for obviousness-type double patenting. On appeal, we limit our analysis to claim 1 of the '895 patent. We begin by construing claim 1 of the '895 patent and claim 7 of the '549 patent to determine whether the former covers subject matter subsequently claimed in the latter. Claim 1 of the '895 patent pertains to a method of treating depression in humans by administering a compound within the class of compounds defined by the following formula:

---

**4.** A patentee can cure invalidity for double patenting by filing a terminal disclaimer, thereby foregoing the portion of the term of the later patent that extends beyond the term of the earlier patent. In the present case, however, Lilly did not file a terminal disclaimer with respect to claim 7 of the '549 patent.

**5.** An absence of overlap between the later claim and the earlier claim does not preclude a conclusion that the later claim is patentably indistinct from the earlier claim.

wherein each R' is independently hydrogen or methyl; wherein R is naphthyl or

wherein R" and R'" are halo, trifluoromethyl, $C_1 - C_4$ alkyl, $C_1 - C_3$ alkyloxy or $C_3 - C_4$ alkenyl; and wherein n and m are 0, 1 or 2; and acid addition salts thereof formed with a pharmaceutically-acceptable acid.

Claim 7 of the '549 patent claims a method for administering the compound fluoxetine hydrochloride to inhibit serotonin uptake. Claim 7 depends on claim 4, which claims a method of blocking the uptake of monoamines by administering a compound found within the same class of compounds that is defined by claim 1 of the '895 patent. Thus, fluoxetine hydrochloride covered in claim 7 of the '549 patent is also one of the compounds encompassed by claim 1 of the '895 patent. It necessarily follows that claim 1 of the '895 patent covered the administration of fluoxetine hydrochloride to treat depression.

Lilly argues that selecting fluoxetine hydrochloride from the class of compounds in claim 1 of the '895 patent to treat depression would not have been obvious to one of ordinary skill in the art because that claim covers thousands of possible compounds. That argument, however, is of no consequence because double patenting is not "concerned with what one skilled in the art would be aware [of] from reading the claims but with what inventions the claims define." *In re Sarett*, 51 C.C.P.A. 1180, 327 F.2d 1005, 1013, 140 U.S.P.Q. 474, 481 (1964). Here, claim 1 of the '895 patent, when properly construed, already covered the administration of fluoxetine hydrochloride for treating depression. Further, Lilly's reliance on *In re Baird*, 16 F.3d 380, 29 U.S.P.Q.2d 1550 (Fed.Cir.1994), and *In re Jones*, 958 F.2d 347, 21 U.S.P.Q.2d 1941 (Fed.Cir.1992), is unavailing. In those cases, we held that a species claim is not necessarily obvious in light of a prior art disclosure of a genus. *See Baird*, 16 F.3d at 382, 29 U.S.P.Q.2d at 1552; *Jones*, 958 F.2d at 350, 21 U.S.P.Q.2d at 1943. The present case, however, in which the same party *claims* a genus in an earlier patent and then *claims* a species in a later patent is entirely different from cases such as *Baird* and *Jones*, in which the prior art merely *discloses* a genus and a later patent claims a species.

Moreover, we find Lilly's argument to be disingenuous because it seeks to use the broad coverage of claim 1 of the '895 patent as both a sword and a shield. Throughout the term of the '895 patent, by virtue of claim 1's broad coverage, Lilly

possessed the right to exclude other parties from administering any of the thousands of claimed compounds, including but not limited to fluoxetine hydrochloride, to treat depression. Thus, for example, if another party attempted to use fluoxetine hydrochloride to treat depression, Lilly could have sued for infringement of the '895 patent or asserted its patent as a dominating patent, *see In re Kaplan*, 789 F.2d 1574, 1577–78, 229 U.S.P.Q. 678, 682 (Fed.Cir.1986) (explaining that domination exists when a broad claim of an earlier patent reads on a narrower claim of a later patent, such that a party cannot practice the later patent without infringing the earlier patent). As a corollary to that expansive right of exclusivity, the '895 patent specification satisfied the written description requirement by allowing persons of ordinary skill in the art "to recognize that the [inventor] invented what is claimed," *In re Gosteli*, 872 F.2d 1008, 1012, 10 U.S.P.Q.2d 1614, 1618 (Fed.Cir.1989), and the enablement requirement by providing a specification that taught one of ordinary skill in the art "how to make and use the invention as broadly as it is claimed," *In re Goodman*, 11 F.3d 1046, 1050, 29 U.S.P.Q.2d 2010, 2013 (Fed.Cir.1993) (quoting *In re Vaeck*, 947 F.2d 488, 496, 20 U.S.P.Q.2d 1438, 1445 (Fed.Cir.1991)). With the '895 patent now expired, Lilly cannot hide behind its once-advantageous broad coverage, disavow its prior compliance with the written description and best mode requirements, and argue that selecting fluoxetine hydrochloride from the class of compounds defined by claim 1 of the '895 patent would not have been obvious.

Having construed claim 1 of the '895 patent and claim 7 of the '549 patent and concluded that the use of fluoxetine hydrochloride is covered by the earlier claim, we must next determine whether there are any differences between the two claims that are patentably distinct. *See Georgia–Pacific*, 195 F.3d at 1327, 52 U.S.P.Q.2d at 1595; *General Foods*, 972 F.2d at 1279, 23 U.S.P.Q.2d at 1844. The only discernible difference between claim 1 of the '895 patent and claim 7 of the '549 patent is that the former addresses the treatment of depression in humans while the latter addresses the treatment of serotonin uptake in animals. Humans are a species of the animal genus, and depression is a species ailment of the genus of ailments caused by defective serotonin uptake. Our case law firmly establishes that a later genus claim is not patentable over an earlier species claim. *See In re Berg*, 140 F.3d 1428, 1437, 46 U.S.P.Q.2d 1226, 1233 (Fed.Cir.1998) (affirming the rejection of genus claims in a later patent application for obviousness-type double patenting in light of species claims in an earlier patent); *In re Lonardo*, 119 F.3d 960, 967, 43 U.S.P.Q.2d 1262, 1267 (Fed.Cir.1997) (invalidating claims in later patent for obviousness-type double patenting when "many of the alleged differences in elements are in species-genus form," with the earlier patent claiming elements more specifically and the later patent claiming elements more generally); *Goodman*, 11 F.3d at 1053, 29 U.S.P.Q.2d at 2016; *In re Vogel*, 57 C.C.P.A. 920, 422 F.2d 438, 442, 164 U.S.P.Q. 619, 622–23 (1970) (affirming a rejection of a claim in a later patent covering a method for packaging meat as obviousness-type double patenting in light of claims in an earlier patent covering a method for packaging pork); *see also Miller v. Eagle Mfg. Co.*, 151 U.S. 186, 198, 14 S.Ct. 310, 38 L.Ed. 121 (1894) (reasoning that a later patent "containing a broader claim, more generical [sic] in its character than the specific claim in the prior patent" is void); *Gosteli*, 872 F.2d at 1010, 10 U.S.P.Q.2d at 1616 (holding that earlier species invention anticipates later generic claim); *Titanium Metals Corp. v. Banner*, 778 F.2d 775, 782, 227 U.S.P.Q. 773, 779 (Fed.Cir.1985) (holding that an earlier species disclosure in the prior art defeats any generic claim). Accordingly, we hold that the differences between claim 1 of the '895 patent and claim 7 of the '549 patent are not patentably distinct.

Furthermore, the circumstances giving rise to the present case support our conclusion that claim 7 is invalid for obviousness-type double patenting. This case arose when Barr filed an ANDA application seeking FDA approval for marketing fluoxetine hydrochloride as an antidepressant, and Lilly responded by suing for infringement of, *inter alia,* claim 7 of the '549 patent. Under the '895 patent, which issued in 1977 and expired in 1994, Lilly possessed the right to exclude others from administering any compound, including fluoxetine hydrochloride, within the class of claimed compounds to treat depression. In effect, under the '895 patent, Lilly had the right to exclude others from engaging in the very conduct for which Barr currently seeks FDA approval. Now, by asserting claim 7 of the '549 patent, Lilly attempts to extend the term of exclusivity it enjoyed under the '895 patent for an additional nine years beyond the statutorily prescribed term. "Effectively extending the patent term, however, is precisely the result that the doctrine of obviousness-type double patenting was created to prevent." *Berg,* 140 F.3d at 1435, 46 U.S.P.Q.2d at 1232.

## IV. CONCLUSION

In sum, because we hold that claim 5 of the '081 patent and claim 7 of the '549 patent comply with the best mode requirement and that claim 7 is invalid for obviousness-type double patenting, we affirm-in-part and reverse-in-part. Also, because we do not reach the issue, we vacate the district court's grant of a jury trial to Barr.

*AFFIRMED–IN–PART, REVERSED–IN–PART, AND VACATED.*

## COSTS

Each party bears its own costs.