# United States Court of Appeals for the Federal Circuit

---

**IN RE JEFFREY HUBBELL, JASON SCHENSE, ANDREAS ZISCH, AND HEIKE HALL**

---

2011-1547
(Serial No. 10/650,509)

---

Appeal from the United States Patent and Trademark Office, Board of Patent Appeals and Interferences.

---

Decided: March 7, 2013

---

RIVKA D. MONHEIT, Pabst Patent Group LLP, of Atlanta, Georgia, argued for appellant. With him on the brief was PATREA L. PABST.

FRANCES M. LYNCH, Associate Solicitor, United States Patent and Trademark Office, of Alexandria, Virginia, argued for appellee. With him on the brief were RAYMOND T. CHEN, Solicitor, and AMY J. NELSON, Associate Solicitor.

---

Before NEWMAN, O'MALLEY, and WALLACH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* O'MALLEY.
Dissenting opinion filed by *Circuit Judge* NEWMAN.

O'MALLEY, *Circuit Judge*.

Jeffrey Hubbell, Jason Schense, Andreas Zisch, and Heike Hall are the named inventors on U.S. Patent Application No. 10/650,509 ("the '509 application"). The examiner rejected all of the pending claims – claims 1-5, 7, 9-14, 16-22, 26-30, 34, and 35 – for obviousness-type double patenting over several patents, including U.S. Patent No. 7,601,685 ("the '685 patent"). Hubbell appeals from the decision of the Board of Patent Appeals and Interferences ("the Board") affirming the examiner's final rejection with respect to the '685 patent. *Ex parte Jeffrey Hubbell, Jason Schense, Andreas Zisch, and Heike Hall*, No. 2010-004497, 2011 Pat. App. LEXIS 19847 (B.P.A.I. May 20, 2011) ("*Board Decision*"). Because the Board did not err in concluding that the pending claims were barred under the doctrine of obviousness-type double patenting, we affirm.

## BACKGROUND

### A. FACTUAL BACKGROUND

The '509 application, entitled "Enzyme-Mediated Modification of Fibrin for Tissue Engineering," was filed on August 27, 2003.[1] The invention relates generally to the field of tissue repair and regeneration, and more specifically to matrices containing bidomain peptides or proteins. Claim 18, which the parties agree is representative

---

[1] The '509 application is a continuation of Application No. 10/024,918 (now abandoned), filed on December 18, 2001, which is a continuation-in-part of Application No. 09/057,052, filed April 8, 1998, now U.S. Patent No. 6,331,422, which is a continuation of International Application No. PCT/US98/06617, filed April 2, 1998, which claims priority to U.S. Provisional Application Serial No. 60/042,143, filed April 3, 1997.

of the pending claims, recites "[a] bidomain protein or peptide comprising a transglutaminase substrate domain and a polypeptide growth factor."

The invention disclosed in the '509 application was based on research Jeffrey Hubbell and Jason Schense conducted while Hubbell was a Professor of Chemical Engineering at California Institute of Technology ("CalTech") and Schense was obtaining his PhD at the same institution. Two other CalTech researchers also assisted Hubbell and are, thus, listed on the '509 application as co-inventors, Andreas Zich and Heike Hall. Because all of the named inventors were affiliated with CalTech, the '509 application is assigned to CalTech.

Hubbell left CalTech and joined the faculty at Eidgenossische Technische Hochschule Zurich ("ETHZ") in 1998 – roughly five years before the '509 application was filed. The application that issued as the '685 patent was filed on December 17, 2002, and is based on research Hubbell and Schense conducted at ETHZ. The '685 patent, entitled "Growth Factor Modified Protein Matrices for Tissue Engineering," issued on October 13, 2009, lists Jeffrey Hubbell, Jason Schense, and Shelly Sakiyama-Elbert as inventors, and is jointly assigned to ETHZ and Universitat Zurich.

Claim 1 of the '685 patent recites:

A fusion protein, comprising:

(i) a first protein domain;

(ii) a second protein domain; and

(iii) an enzymatic or hydrolytic cleavage site between the first and second domains;

wherein the first domain is a growth factor selected from the group consisting of the platelet derived growth factor superfamily and the

transforming growth factor beta (TGF[beta]) superfamily;

wherein the second domain is a crosslinking Factor XIIIa substrate domain;

wherein the enzymatic cleavage site is selected from the group consisting of proteolytic substrates and polysaccharide substrates, and

wherein the hydrolytic cleavage site comprises a substrate with a linkage which undergoes hydrolysis by an acid or a base catalyzed reaction.

'685 Patent, col. 55, ll. 29-47.

It is undisputed that, although the '509 application and the '685 patent have two inventors in common – Hubbell and Schense – they do not have identical inventive entities and have neither common owners nor common assignees.[2]

## B. PROCEDURAL HISTORY

The '509 application at issue on appeal is a continuation of Application No. 10/024,918 ("the '918 application"), which was filed on December 18, 2001. The '918 application shares the same title and same inventors as the '509 application on appeal, and was likewise assigned to CalTech. During prosecution of the '918 application, the examiner rejected all of the pending claims based on obviousness-type double patenting over U.S. Patent No.

---

[2] The application for the '685 patent was a continuation-in-part of Application No. 09/563,760, filed on May 1, 2000, now U.S. Patent No. 6,894,022, which is a continuation-in-part of Application No. 09/141,153, filed on August 27, 1998, now abandoned. Accordingly, though the '685 patent issued first, it is not available as prior art under 35 U.S.C. §§ 102 or 103 against the claims in the '509 application.

6,331,422 ("the '422 patent") and Application No. 09/695,466, which issued as U.S. Patent No. 6,607,740 ("the '740 patent") on August 19, 2003. Hubbell and Schense are the named inventors on the '422 and '740 patents, and both patents were assigned to CalTech.

In response to the examiner's rejection, Hubbell submitted two terminal disclaimers, amended certain claims, and added new claims. The examiner indicated that claims 1-17 of the '918 application were allowable, and Hubbell cancelled the remaining claims. Although the examiner issued a Notice of Allowance in June 2003, Hubbell failed to pay the issue fee within the statutory period, let the '918 application go abandoned, and instead filed the '509 application on August 27, 2003.

In a final Office Action dated October 5, 2007, the examiner rejected claims 1-5, 7, 9-14, 16-22, 26-30, 34, and 35 of the '509 application for obviousness-type double patenting over the '422 and '740 patents, the application that issued as U.S. Patent No. 7,247,609 ("the '609 patent") to Lutolf, *et al.*, and the application that issued as the '685 patent (Application No. 10/323,046). In relevant part, the examiner found that the conflicting claims in the '685 patent "are a species of the instantly claimed invention and as such are encompassed by the claimed invention and thus anticipate the claimed invention." *Board Decision*, 2011 Pat. App. LEXIS 19847, at *11. Hubbell appealed the rejections to the Board.

On appeal, the Board reversed the examiner's obviousness-type double patenting rejection over the '609 patent and affirmed the rejections over the '422, '740, and '685 Patents. Because Hubbell indicated that he would file terminal disclaimers with respect to the '422 and '740 patents, the Board summarily affirmed those rejections. That portion of the Board's decision is not at issue on appeal.

Turning to the examiner's rejection for obviousness-type double patenting over certain claims in the '685 patent, the Board agreed with the examiner that the claims of the '685 patent anticipate representative claim 18. Specifically, the Board found that claim 1 of the '685 patent recites a protein that contains both of the features required in rejected claim 18: "a transglutaminase substrate domain (the crosslinking Factor XIIIa substrate domain) and a domain encoding a growth factor." *Board Decision*, 2011 Pat. App. LEXIS 19847, at *13. The Board also noted that claim 18's use of the term "comprising" allowed for inclusion of the additional elements recited in claim 1 of the '685 patent, including an enzymatic cleavage site not otherwise recited in claim 18. Accordingly, the Board found the obviousness-type double patenting rejection proper because the genus claim in the '509 application was anticipated by issued claims directed to a species falling within that genus.

Next, the Board rejected Hubbell's argument that common ownership is a requirement for obviousness-type double patenting. It began its analysis by citing the Manual of Patent Examining Procedure ("MPEP"), which provides that: "[d]ouble patenting may exist between an issued patent and an application filed by the same inventive entity, or by a *different inventive entity having a common inventor*, and/or by a common assignee/owner." MPEP § 804(I)(A) (emphasis added). The Board further relied on this court's prior case law regarding obviousness-type double patenting in which we recognized a "concern over potential harassment of an infringer by multiple assignees asserting essentially the same patented invention," even where there was no common ownership. *Board Decision*, 2011 Pat. App. LEXIS 19847, at *15 (citing *In re Van Ornum*, 686 F.2d 937 (CCPA 1982) and *In re Fallaux*, 564 F.3d 1313 (Fed. Cir. 2009)). Given this concern, the Board concluded that common ownership is not required and that obviousness-type patent-

ing applied here because the earlier-issued '685 patent and the '509 application share two common inventors. Hubbell timely appealed that issue to this court, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A).

## DISCUSSION

Obviousness-type double patenting is a judicially-created doctrine designed to "prevent claims in separate applications or patents that do not recite the 'same' invention, but nonetheless claim inventions so alike that granting both exclusive rights would effectively extend the life of patent protection." *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1373 (Fed. Cir. 2005) (citation omitted). It prohibits the issuance of claims in a second patent that are "not patentably distinct from the claims of the first patent." *In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985) (citations omitted). A later patent claim "is not patentably distinct from an earlier claim if the later claim is obvious over, or anticipated by, the earlier claim." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 968 (Fed. Cir. 2001) (citations omitted).

There are two justifications for obviousness-type double patenting. The first is "to prevent unjustified time-wise extension of the right to exclude granted by a patent no matter how the extension is brought about." *Van Ornum*, 686 F.2d at 943-44 (quotation and citation omitted). The second rationale is to prevent multiple infringement suits by different assignees asserting essentially the same patented invention. *Fallaux*, 564 F.3d at 1319 (recognizing that "harassment by multiple assignees" provides "a second justification for obviousness-type double patenting"); *see also* Chisum on Patents § 9.04[2][b][ii] ("The possibility of multiple suits against an infringer by assignees of related patents has long been recognized as one of the concerns behind the doctrine of double patenting."). Obviousness-type double patenting is a question of law that we review *de novo*. *In re Emert*,

124 F.3d 1458, 1460 (Fed. Cir. 1997). We review the Board's factual findings for substantial evidence. *See In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).

On appeal, Hubbell does not dispute that Claim 1 of the '685 patent anticipates representative Claim 18 of the '509 application. Instead, Hubbell argues that obviousness-type double patenting should not apply where, as here, an application and a conflicting patent share common inventors but do not have *identical* inventive entities, were never commonly owned, and are not subject to a joint research agreement. In the alternative, if the court finds that an obviousness-type double patenting rejection is applicable, Hubbell argues that either he should be allowed to file a terminal disclaimer as an equitable measure or that this court should employ a two-way obviousness analysis for the rejected claims.

In response, the Director argues that: (1) whether the application and patent were ever commonly owned is immaterial to the policy of preventing harassment by multiple assignees; (2) identity of inventors is not required where there is an overlap in the inventors; (3) Hubbell has not established any grounds upon which he should be allowed to file a terminal disclaimer; and (4) Hubbell is not entitled to a two-way obviousness analysis because he admitted that he partially is responsible for the delay that caused the '685 patent claims to issue first.[3] For the reasons explained below, we agree with the Director on each point.

---

[3] The Director also argues that Hubbell waived his terminal disclaimer and two-way obviousness analysis arguments by failing to raise them before the Board. In response, Hubbell contends that these arguments relate to the same *issue* presented to the Board: whether obviousness-type double patenting should apply in situations where the application and conflicting patent are not

## A.  OBVIOUSNESS-TYPE DOUBLE PATENTING

The first issue on appeal is whether obviousness-type double patenting applies where an application and a conflicting patent have one or more inventors in common but the inventive entities are not identical and the applications were never commonly owned.  Although Hubbell argues that this issue is one of first impression, the Board found that: (1) the MPEP specifically contemplates application of obviousness-type double patenting in these circumstances; and (2) this court's prior case law supports application of obviousness-type double patenting in instances where there is no common ownership.  We agree with the Board.

First, as noted, the MPEP provides that obviousness-type double patenting may exist between an issued patent and an application filed by "the same inventive entity, or by a *different inventive entity having a common inventor*, and/or by a common assignee/owner."  MPEP § 804(I)(A) (emphasis added).  Although the MPEP is not binding on this court, we can take judicial notice of this provision to the extent it does not conflict with statutory text.  *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 964 (Fed. Cir. 2002) (stating that the PTO Guidelines governing its internal practice and the MPEP "are not binding on this court, but may be given judicial notice to the extent they do not conflict with the statute").  As discussed below, moreover, the MPEP standard is consistent with the

commonly owned.  Hubbell further argues that, since he urges this court to permit filing of a terminal disclaimer or application of the two-way test as an equitable measure, "[n]either of these remedies could have been granted by the Board."  Appellants' Reply 13.  Regardless of whether Hubbell waived these arguments, as discussed below, we find them to be without merit.

rationale we have used to support application of obvious-
ness-type double patenting rejections.

Hubbell's primary argument is that obviousness-type
double patenting should never be applied in the absence
of common ownership of the applications at issue. We
have already rejected that contention. In *Van Ornum*, for
example, our predecessor court affirmed an obviousness-
type double patenting rejection over a patent with a
common inventor, despite a lack of common ownership.
In that case, as here, the claims in the application were
generic to the species claims in the patents on which the
double patenting rejection was based. *Van Ornum*, 686
F.2d at 938. Although the application and the patents
shared a common inventive entity, the inventors assigned
one of the patents to General Motors and assigned the
second patent, as well as the application at issue, to
Rockcor, Inc. *Id.* at 938-39. Because the application's
generic claims "disclosed no additional invention or dis-
covery other than what ha[d] already been claimed" in the
prior patents, the court concluded that the double patent-
ing rejection was "fully justified." *Id.* at 944. The court
further found that, because the application and conflicting
patents were not commonly owned, the applicants could
not file a terminal disclaimer to overcome the rejection.
*See id.* at 944-48 (approving the common ownership
requirement for terminal disclaimers set forth in 37
C.F.R. § 1.321). In reaching this conclusion, the court
recognized the importance of preventing harassment of an
alleged infringer by multiple assignees asserting essen-
tially the same patented invention.

Likewise, in *Fallaux*, this court reaffirmed the multi-
ple assignee harassment rationale and applied it to a
situation where, as here, the patents were related to the
application only by way of a common inventor. *See
Fallaux*, 564 F.3d at 1315 ("The reference patents for the
double patenting rejection on appeal – the Vogels patents
– are related to the Fallaux application only by way of a

single common inventor – Abraham Bout."). While this court noted that neither party raised the issue of whether a patent may be used as a reference for an obviousness-type double patenting rejection where it shares only a common inventor with the application, and cautioned that the "opinion should not be read to decide or endorse the PTO's view on this issue," it concluded that the harassment justification for obviousness-type double patenting is "particularly pertinent" in such circumstances. *Id.* at 1315 n.1, 1319. The court also pointed out that the lack of common ownership in that case "was of the applicant's creation as through assignment it allowed ownership of the applications to be divided among different entities." *Id.* at 1319.

On appeal, Hubbell argues that *Van Ornum* and *Fallaux* are distinguishable because in those cases, unlike here, the applications at issue were *once* commonly owned. Hubbell also contends that *Van Ornum* should be limited to its facts and that both *Van Ornum* and *Fallaux* "should be read as standing for the proposition that in situations where . . . the complaining party is 'responsible for' the divided assignment, issuance of the second patent is 'impermissible and barred by the public policy of harassment by multiple assignees.'" Appellants' Br. 15 (citations omitted). According to Hubbell, because Cal-Tech did not control the ownership of the '685 patent and was not responsible for the divided assignment, obviousness-type double patenting should not apply. Hubbell's arguments are not well-taken.

It is undisputed that the '685 patent is assigned to ETHZ and Universitat Zurich, whereas the '509 application is assigned to CalTech. While Hubbell is correct that CalTech was not responsible for the bifurcated assignment, the fact remains that, if Hubbell's rejected application claims were to issue, the potential for harassment by multiple assignees would exist because an infringer of claim 1 of the '685 patent would also infringe at least

rejected claim 18. As such, there is a risk that a potential infringer could be subject to suit from both CalTech and ETHZ and Universitat Zurich under their respective patents. The fact that Hubbell controlled the assignment by moving from one institution to another does not alter this analysis.

Although Hubbell attempts to distinguish *Van Ornum* and *Fallaux* on grounds that the applications involved in those cases were once commonly owned, this distinction does not alleviate the underlying harassment concerns here. As the Director points out, the "possibility of harassment by multiple assignees exists when *issued patents* lack common ownership. Thus, whether the *applications* that led to the issued patents were ever commonly owned is irrelevant." Appellee's Br. 16. And, as we recognized in *Fallaux*, the harassment justification is "particularly pertinent" in cases where, as here, the application and the conflicting patent are not commonly owned.

Based on the foregoing, although Hubbell argues that we should create a specific exception barring application of obviousness-type double patenting in instances where the conflicting claims share only common inventors, rather than common ownership, we see no valid basis for doing so. Because it is undisputed that an infringer of the '685 patent would also infringe the '509 application, the multiple assignee harassment justification adopted in *Van Ornum* and reaffirmed in *Fallaux* applies here, despite the lack of common ownership.

While not the thrust of his contentions on appeal, Hubbell also seems to argue that obviousness-type double patenting should not apply where the overlap in inventorship is not complete, i.e., where the inventive entities are not identical in all respects. Here, Hubbell was the first named inventor on both the '590 application and the '685 patent and Schense was the second. The '509 had two other named inventors and the '685 patent had one. It is

undisputed that this overlap in inventorship is precisely the type of relationship that would give rise to double patenting under the MPEP. Hubbell does not explain why the MPEP is wrong to treat cases, like his, where the overlap in inventorship is substantial any differently than cases where the overlap is complete. We too can find no reasoned basis to differentiate between cases involving identical "inventive entities" and those where the inventive entities are almost identical when assessing obviousness-type double patenting rejections. Indeed, <u>Fallaux</u> drew no such distinction and endorsed an obviousness-type double patenting rejection despite the absence of identity among inventors.[4]

For these reasons, we reject Hubbell's request that we insist upon a complete identity of inventors or common ownership as a prerequisite to an obviousness-type double patenting rejection and find the Board's rejection to have been proper on the facts presented here.

## B. TERMINAL DISCLAIMER

In the alternative, Hubbell argues that, if obviousness-type double patenting does apply, we should authorize him to file a terminal disclaimer and thus avoid any concern regarding undue extension of the rights granted in the '685 patent. As a general rule, a terminal disclaimer filed to overcome an obviousness-type double patenting rejection is effective only where the application and conflicting patent are commonly owned. *See Fallaux*, 564 F.3d at 1319 ("If the Fallaux application and the Vogels patents were commonly owned, the terminal disclaimer filed in this case would have been effective to overcome the double patenting rejection."). Indeed, 37 C.F.R.

---

[4] On this point, we are unpersuaded by the dissents' citation to an outdated version of the MPEP or to cases which discuss the concept of an inventive entity in entirely different contexts.

§ 1.321(c)(3) specifically provides that a terminal disclaimer "filed to obviate judicially created double patenting in a patent application" must include "a provision that any patent granted on that application . . . shall be enforceable only for and during such period that said patent is *commonly owned* with the application or patent which formed the basis for the judicially created double patenting." 37 C.F.R. § 1.321(c)(3) (emphasis added).

Recognizing that there is neither common ownership nor a common assignee here, Hubbell points to the Cooperative Research and Technology Enhancement Act of 2004 ("the CREATE Act"), which amended 35 U.S.C. § 103(c) to provide that otherwise unrelated persons can be treated as common owners under the statute if: (1) they are parties to a joint research agreement that was in effect on or before the claimed invention was made; (2) the claimed invention was made as a result of activities undertaken within the scope of the joint research agreement; and (3) "the application for patent for the claimed invention discloses or is amended to disclose the names of the parties to the joint research agreement." 35 U.S.C. § 103(c)(2)(A)-(C).

Because the '509 application and the '685 patent are not commonly owned and there is no joint research agreement between the assignees, Hubbell's reliance on the CREATE Act is misplaced. Although Hubbell argues that this court should ignore the joint research agreement requirement and nonetheless permit the filing of a terminal disclaimer, there is no statutory basis for doing so, and we decline Hubbell's invitation to rewrite the statutory text by creating a new equitable right to resort to terminal disclaimers. We conclude that, because Hubbell does not qualify for a terminal disclaimer under the statute, he is not entitled to file one as an equitable measure.

## C.  TWO-WAY OBVIOUSNESS ANALYSIS

Finally, Hubbell argues that the rejected claims should be reconsidered under a two-way obviousness analysis.  As a general rule, a "one-way" test applies to determine obviousness-type double patenting.  *In re Berg*, 140 F.3d 1428, 1432 (Fed. Cir. 1998).  Under that test, "the examiner asks whether the application claims are obvious over the patent claims."  *Id.*  In certain circumstances, however, a two-way test may apply, wherein the examiner "also asks whether the patent claims are obvious over the application claims.  If not, the application claims later may be allowed."  *Id.*

The two-way test, which is "a narrow exception to the general rule of the one-way test," arose out of the concern to:

> prevent rejections for obviousness-type double patenting when the applicants filed first for a basic invention and later for an improvement, but, through no fault of the applicants, the PTO decided the applications in the reverse order of filing, rejecting the basic application although it would have been allowed if the applications had been decided in the order of their filing.

*Id.*  We have explained that the two-way test is appropriate only in the "unusual circumstance" where "the PTO is *solely* responsible for the delay in causing the second-filed application to issue prior to the first."  *Id.* at 1437 (emphasis added).  Whether a one-way or two-way analysis applies is a question of law that we review without deference.  *In re Basell Poliolefine Italia S.P.A.*, 547 F.3d 1371, 1375 (Fed. Cir. 2008) (citation omitted).

On appeal, Hubbell argues that he is entitled to a two-way obviousness analysis because: (1) the claims in the '509 application and the claims in the '685 patent could not have been filed together; and (2) "on a balance,

the PTO was responsible for the claims in the '685 patent issuing before the present claims." Appellants' Br. 26. In response, the Director argues that a two-way analysis is not applicable because Hubbell cannot establish that the PTO is solely responsible for any delays associated with the claims on appeal. We again agree with the Board.

First, during the hearing before the Board, counsel specifically conceded that Hubbell was partially responsible for the delay that caused the '685 patent to issue before the application claims. J.A. 313, ll. 11-12 (MS. MONHEIT: "So the PTO shares responsibility. I'm not saying that we're blameless. I'm just saying that there is shared responsibility.").[5] Counsel also conceded that Hubbell could have presented the claims at issue on appeal in December 2001, but failed to do so until August 2003. *See* J.A. 312, ll. 19-24 ("JUDGE FREDMAN: "This isn't a situation where the PTO prevented you from presenting these claims way back in 1998 or whatever it would've been when you had the first case." MS. MONHEIT: "The earliest point that we could have presented [the claims on appeal] is when we filed that CIP, which is in 2001."). This admission further supports the conclusion that the PTO was not solely responsible for the delay. *See Eli Lilly*, 251 F.3d at 969 n. 7 (recognizing that an admission "that the claim[s] could have been presented earlier . . . indicates that the delay was not solely caused by the PTO").

Finally, the record reveals that, in June 2003, the examiner allowed claims very similar to those at issue on appeal. Rather than permitting those claims to issue,

---

5   Likewise, in his briefing on appeal, Hubbell admitted shared responsibility. *See* Appellants' Br. 26 (stating that, "*on a balance*, the PTO was responsible for the claims in the '685 patent issuing before the present claims") (emphasis added)).

Hubbell failed to pay the issue fee, let the '918 application claims go abandoned, and filed the '509 application in August 2003.[6]  These prosecution choices resulted in the foreseeable consequence that the '685 patent issued before the application claims on appeal.  Given these circumstances, and because it is undisputed that the PTO was not solely responsible for the delay, Hubbell is not entitled to a two-way obviousness analysis.[7]

---

[6]  During oral argument, counsel for Hubbell explained that CalTech – the assignee of the '918 application – intentionally let the claims go abandoned.  *See* Oral Argument at 26:30, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/2011-1547/all ("The claims required recombinantly producing the fusion protein . . . when the claims were granted CalTech looked at those claims and said 'you know what, we disclosed that it doesn't have to be limited to recombinantly producing it.  Let's refile it; we'll get it allowed quickly.'").

[7]  Hubbell also argues that this court should extend its reasoning from *In re Braat*, 937 F.2d 589 (Fed. Cir. 1991), and should apply the two-way test as an equitable measure.  In *Braat*, we recognized that "basic and improvement patents should not be penalized by the rate of progress of the applications through the PTO, a matter over which the applicant does not have complete control." *Id.* at 593.  In that case, we noted that: (1) the common assignee could not have filed the rejected application claims with the patent claims because they had different inventive entities; and (2) it was *not* the assignee's fault that the patent claims issued first.  *Id.* at 594.  As the Director points out, *Braat* "stands for the general proposition that the two-way test applies when a later-filed improvement application issues before an earlier-filed basic application due entirely to the USPTO." Appellee's Br. 21 (citing *Berg*, 140 F.3d at 1432-34; *Braat*, 937 F.2d

CONCLUSION

For the foregoing reasons, and because we find that Hubbell's remaining arguments are without merit, we conclude that the Board properly affirmed the examiner's decision rejecting the pending application claims based on obviousness-type double patenting in view of the '685 patent. Accordingly, the Board's decision is affirmed.

**AFFIRMED**

---

at 593-94). In *Berg*, moreover, we noted that, "even in a case where the inventions could not have been filed in a single application, if the applicant thereafter controlled the respective rates of prosecution to cause the species or improvement claims to issue prior to the genus or basic invention claims . . . such applicant seems not to be entitled to the two-way test under settled case law." 140 F.3d at 1434 n.6 (citation omitted). Given that Hubbell has conceded partial responsibility for the delay, his reliance on *Braat* is misplaced.

# United States Court of Appeals for the Federal Circuit

IN RE JEFFREY HUBBELL, JASON SCHENSE,
ANDREAS ZISCH, AND HEIKE HALL

2011-1547
(Serial No. 10/650,509)

Appeal from the United States Patent and Trademark
Office, Board of Patent Appeals and Interferences.

NEWMAN, *Circuit Judge*, dissenting.

In accordance with the law of double patenting, dou-
ble patenting does not apply when the application and
patent are of separate ownership and have separate
inventive entities. In such situation the appropriate
examination path is on the merits of the invention, or
through the interference or derivation procedures, or
other standard protocol as may apply in the particular
situation. The technology here appears to involve generic
and species inventions; such separate developments are
not unusual, and there exists extensive precedent to guide
patentability. This court need not create a new protocol
wherein the contributions of distinct entities and separate
ownership are rejected for "double patenting" instead of
examined under the established rules.

The court today not only finds "double patenting"
when there is neither common inventorship nor common
ownership, but having so found withholds the standard

remedy of the terminal disclaimer, and simply denies the application. This novel ruling is contrary to statute and precedent, with no policy justification for changing the law. I respectfully dissent.

## DISCUSSION

In the entire body of precedent relating to rejection on the ground of double patenting, the rejected patents or applications were of common inventorship or common ownership. This is illustrated in early examples such as *Miller v. Eagle Manufacturing*, 151 U.S. 186 (1894), where the inventor had divided his patent application into two separate applications that issued as patents, and the Court held that the second patent could only be justified if the later-issued claim "is clearly distinct from and independent of, one previously patented." *Id.* at 199–200. Earlier, in *James v. Campbell*, 104 U.S. (14 Otto.) 356, 382 (1882), the Court stated that "[i]t is hardly necessary to remark that the patentee could not include in a subsequent patent any invention embraced or described in a prior one granted to himself, any more than he could an invention embraced or described in a prior patent granted to a third person."

The Court of Customs and Patent Appeals applied this precedent in cases such as *In re Barge*, 96 F.2d 314, 316 (CCPA 1938), where the court explained that "an applicant . . . is not entitled to two patents if his disclosure in the later application is not inventive over that for which he has already received a patent." The concept was extended to commonly-owned patents, as in *In re Borcherdt*, 197 F.2d 550, 551 (CCPA 1952) ("two patents may not issue for different forms or species of the same invention when they are non-inventively different" and "the same principle applies to patents of different inventors granted to a common assignee"); *see also In re Newton*, 414 F.2d 1400 (CCPA 1969); *In re Bowers*, 359 F.2d 886 (CCPA 1966).

The CCPA referred to the policy of avoiding extension of the term of exclusivity, and also recognized reasons such as "possible harassment by multiple assignees, inconvenience to the Patent Office, and the possibility that one might avoid the effect of file wrapper estoppel." *In re Robeson*, 331 F.2d 610, 615 (CCPA 1964). Discussing the possibility of harassment, on which my colleagues on this panel place emphasis, the court stated:

> [Issuance of multiple patents] is a very common situation existing with respect to genus and species, dominant and subservient, and 'overlapping' patents, whenever there are *unobvious* differences, all granted in strict accordance with law and presumed valid. Yet we do not see the courts bogged down with harassment suits. In those rare instances where there is a situation which a court can be persuaded amounts to harassment, it has means for dealing with it by inflicting attorney's fees. This can be a powerful deterrent.

*In re Jentoft*, 392 F.2d 633, 641 (CCPA 1968); *see In re Eckel*, 393 F.2d 848, 857 (CCPA 1968).

The CCPA elaborated on the definition of inventive entity as a predicate for double patenting. In *In re Land and Rogers*, 368 F.2d 866, 879 (CCPA 1966) the court stated:

> The question here is not merely whether A or B, individually, is or is not "another" to A & B jointly on a theory of "different legal entities." Of course they are different "entities" in the sense that an invention made jointly by A & B cannot be the sole invention of A or B and vice versa, and certain legal consequences flow from such fact, such as who must apply for patent.

The Manual of Patenting Examining Procedure has also defined "inventive entity" for purposes of the law of double patenting:

> The inventive entity is the sole inventor or the joint inventors listed on a patent or patent application. A sole inventor in one application and joint inventors in another application cannot constitute a single or the same entity, even if the sole inventor is one of the joint inventors. Likewise, two sets of joint inventors do not constitute a single inventive entity if any individual inventor is included in one set who is not also included in the other set.

MPEP §804 (4th ed. 1979). The Federal Circuit observed in *In re Kaplan*, 789 F.2d 1574 (Fed. Cir. 1986), that: "It is a given, of course, that a sole inventor and joint inventors including the sole inventor are separate 'legal entities,' a legal proposition from which certain legal consequences flow."

The law of double patenting evolved in various factual situations, but never departed from the requirement of either common inventorship or common ownership, and never departed from the available remedy of terminal disclaimer for obviousness-type double patenting. This remedy draws on the 1952 codification that any patentee or applicant may "disclaim or dedicate to the public the entire term, or any terminal part of the term, of the patent granted or to be granted," 35 U.S.C. §253. As explained by P.J. Federico, Examiner-in-Chief of the United States Patent Office and a draftsman of the 1952 Act:

> No specific reason for this provision appears in the printed record, but its proponents contemplated that it might be effective in some instances, in combating a defense of double patenting, to permit the patentee to cut back the term of a later is-

> sued patent so as to expire at the same time as the earlier issued patent and thus eliminate any charge of extension of monopoly.

35 U.S.C.A. 1, 49 (1954), *reprinted at* 75 J. Pat. & Trademark Off. Soc'y 161 (1993).

In *In re Griswold*, 365 F.2d 834 (CCPA 1966), the CCPA reviewed a terminal disclaimer that included a provision that the second patent would "be enforceable only for and during such period that the legal title to said patent and to such right to recover shall be the same respectively as" the first patent. *Id.* at 840 n.5. The CCPA remarked that such a provision would eliminate any possibility of harassment if the two patents later came into separate hands, and the Patent Office duly amended its Rule 321 to require that terminal disclaimers contain such a "non-alienation" agreement. 37 C.F.R. §1.321(b).

The CCPA upheld this authority to require non-alienation in *In re Van Ornum*, 686 F.2d 937, 948 (CCPA 1982), where the inventors of the patent and the application had already assigned rights to different companies; the court held that there was double patenting, for there was a common inventive entity, but that the remedy of terminal disclaimer was not available because the patentee had purposely divided ownership in the patent and application and could not comply with the non-alienation requirement. My colleagues state that Van Ornum supports their application of double patenting in this case; if anything, Van Ornum supports the contrary. In *In re Longi*, 759 F.2d 887, 895 (Fed. Cir. 1985), this court referred to the "important legislative history" of the enactment in 1984 of §103(c)(1) relating to commonly owned applications of different inventive entities, whereby the applications are subject to terminal disclaimer in order to avoid unwarranted extension of the term of patent protection:

> The Committee expects that the Patent and Trademark Office will reinstitute in appropriate circumstances the practice of rejecting claims in commonly owned applications of different inventive entities on the ground of double patenting. This will be necessary in order to prevent an organization from obtaining two or more patents with different expiration dates covering nearly identical subject matter.

Patent Law Amendment Act of 1984, 130 Cong. Rec. H10,527 (1984). The legislative record explained that when the ownership is the same, whether or not the inventorship is different, rejection on the ground of double patenting can be overcome "by disclaiming the terminal portion of the term of the later patent, thereby eliminating the problem of extending patent life." *Id.* The panel majority misapplies §103(c)(1), for the statute is directed to situations of common ownership; it does not provide that when there is not common ownership there can be no patent.

Until today, there has been no departure from the principles of the law of double patenting. In the case at bar, neither a common inventive entity not common ownership is present. The application in suit is assigned to the California Institute of Technology; and is for a protein or peptide with a transglutaminase substrate and a polypeptide growth factor. It has four inventors that include Hubbell and Schense; the provisional application's filing date is April 3, 1997. In 1998 Hubbell and Schense joined the faculty at the Eidgenossiche Technische Hochschule Zurich (ETHZ) and the Universitat Zurich, and a parent application directed to a species within the genus was filed on August 27, 1998 and assigned to ETHZ, with three inventors that include Hubbell and Schense.

The panel majority does not dispute that these are different inventive entities and that there is not common ownership. However, the court rules that obviousness-type double patenting applies. If there indeed is obviousness-type double patenting, then a terminal disclaimer is necessarily available. However, the court rules that a terminal disclaimer is not available because there is not common ownership. Yet if there is not common ownership or common inventorship, there cannot be double patenting. On this circularity, the court denies the CalTech application on the ground of double patenting.

The panel majority miscites *In re Fallaux*, 564 F.3d 1313 (Fed. Cir. 2009), for that ruling disclaimed the holding for which its authority is now asserted. The *Fallaux* court referred to a provision in the MPEP and stated that "This opinion should not be read to decide or endorse the PTO's view on this issue." *Id.* at 1316 n.1. My colleagues now cite this footnote as authority for the holding it declined to make.

The CalTech application and the ETHZ patent were never commonly owned, unlike those of *Fallaux* and *Van Ornum,* where ownership was divided during pendency. Genus and species patents are not unusual; there is no suggestion of any attempt to "game" the system.[1] From the court's flawed ruling on incorrect law, I respectfully dissent.

---

[1] CalTech has asked for equitable relief in the form of authorization to file a terminal disclaimer; I would not foreclose such a possibility.